**OHIO VALLEY ROCK ASPHALT CO., Inc., v. HELVERING, Com'r of Internal Revenue (two cases).**

Nos. 6452, 6453.

United States Court of Appeals for the District of Columbia.

Argued Nov. 11, 1937.

Decided Dec. 27, 1937.

J. Nelson Anderson, of Washington, D. C., for petitioner.

Robert H. Jackson, Frank J. Wideman, and James W. Morris, Asst. Attys. Gen., and Sewall Key, Dean P. Kimball, J. Louis Monarch, and Paul R. Russell, all of Washington, D. C., for respondent.

Before GRONER, STEPHENS, and MILLER, Associate Justices.

GRONER, J.

These are appeals from decisions of the Board of Tax Appeals involving deficiencies in income taxes for the calendar years 1925 and 1929 in the respective amounts of $2,342.61 and $5,477.06. Petitioner is a Kentucky corporation, organized in 1922 to take over certain leases of lands permitting the removal therefrom of rock asphalt, which it crushed and sold for use in street work, etc. Petitioner claimed deductions for depletion in the years in question but the Commissioner denied the claim, and the Board affirmed.

The leases had been accumulated by three individuals, F. D. Wood, W. H. Giltner, and P. J. McGovern. The lessors were entitled to rents and royalties on the basis of amount of mineral produced. In their dealings with petitioner, Wood, Giltner, and McGovern grouped the leases into two classes, one class covering approximately 2,000 acres near the town of Summit, Kentucky, the other covering from 35,000 to 45,000 acres located some distance from the Summit acreage in the counties of Hardin, Hart, Grayson, and Breckenridge. The Board found as a fact that:

"On January 14, 1922, the three associates entered into an agreement under the terms of which Wood was to arrange for the organization of the petitioner to which the leases were to be assigned in consideration of cash, bonds, stock, and rents or royalties in addition to those called for in the leases. $200,000 of the bonds were to be in consideration of the large acreage away from Summit. * * * After the petitioner was organized all of the leases were assigned to it. It mortgaged its properties to secure a bond issue of $300,000. It paid for [all] the leases at that time:

Cash ........................ $122,464.57
Stock ....................... 121,623.53
Bonds ....................... 300,000.00

* * *

"The petitioner did some core drilling to prove the mineral content of some of the 2,000 acres near Summit. No attempt was ever made to prove or develop any of the acreage away from Summit. At the end of 1923 Wood, Giltner, and McGovern surrendered $150,000 par value of the bonds they had received from the petitioner. These bonds were cancelled. The reason for this adjustment in the consideration for the leases was that the officers of the petitioner had let the leases on about 20,000 acres away from Summit go to default because they believed the land did not contain merchantable asphalt in paying quantities. * * * In 1923 the petitioner obtained its first production. This was from a part of a tract of 300 or 350 acres covered by leases from Reno, Hart, and Ready [a part of the 2,000 acres at Summit]. It continued to operate on a part of this tract throughout the period here involved and the number of tons produced in each year from 1923 to 1930, inclusive, are in evidence, together with an estimate of the remaining asphalt in that tract as of the close of 1930. * * *"

The Board in the latter part of July, 1933, on the facts held: (1) That there was not sufficient proof of the cost of the leases, (2) that there was not sufficient evidence of the estimated mineral reserve as of any date of all the properties originally leased or of the acreage away from Summit in whole or in part or of the entire 2,000 acres at Summit, and (3) that there was no evidence of mineral sold in any year; and accordingly the Board sustained the Commissioner's determination.

Within the time allowed under the rules, petitioner applied for a rehearing, setting out as one of its grounds that since the decision it had been able to locate the engineer who had made the original estimate of mineral reserve in the entire acreage, that it had not been able to locate him prior to that time though it had made diligent effort to do so, and that, if allowed a rehearing, the witness was qualified to and would testify as to the original mineral reserves. In the concluding paragraph of its motion petitioner said: "5. Finally, the Petitioner has not been allowed one penny as a deduction on account of the depletion of its asphalt properties, and yet those properties are entirely responsible for its income. * * *"

First. All the evidence on the hearing was given by witnesses offered by petitioner. The Commissioner offered no evidence. The evidence for petitioner showed, as the Board found, that petitioner was organized to acquire certain properties held under leaseholds for terms of five years but with right to renewal as long as merchantable asphalt was found; that these properties were separable and in fact were separated into two groups, one group consist-

ing of 2,000 acres located around the village of Summit, and the other group consisting of 35,000 or more acres located in a number of counties from 40 to 100 miles away; that the holders of the leases contracted with petitioner to assign and transfer them in consideration of the payment for the Summit group of $122,464.57 in cash, $121,623.53 in stock, and $100,000 of bonds, and to assign and transfer the outlying group for $200,-000 in bonds. The evidence likewise showed that petitioner sold considerably more than $200,000 of other stock at par for cash and that its bonds were sold during the years in question at face value. In addition, there appears to have been some trading in the stocks and bonds at par. So, at least prima facie, there was evidence that the cost of the 2,000 acres around Summit amounted to $344,088.10. The other tracts were soon discovered to be worthless for the company's purposes. About 20,000 acres were lost by default in payment of rentals, and $150,000 of bonds of the total of $200,000 delivered to Wood and his associates as consideration for the leases were surrendered and cancelled. Whether the $50,000 of bonds, the difference between the amount paid and the amount returned, be charged to the 20,000 of forfeited acreage or to the balance of the acreage away from Summit subsequently forfeited, or as a loss on the original purchase, is in the view we take, of no consequence since it is apparent that neither the acquisition nor surrender of the outlying acreage plays any part in the computation the Board was called upon to make. Petitioner concedes that no cost should be allocated to that acreage, and since from only 300 of the 2,000 acres at Summit has asphalt been taken the problem of cost is confined to the single query whether the entire three hundred and forty-odd thousand dollars paid for the 2,000 Summit acreage should be regarded as the basic cost, or whether only the part thereof covered by what are called on the record the Reno, Hart, and Ready leases (300 acres) should be valued separately and apart, and the cost allocable to that portion alone of the 2,000-acre tract should be adopted as the value of the property on which depletion is to be computed. The Board passes over this question without any definite finding on the subject, except to express some doubt of the true market value of the stocks and bonds. We think there was evidence upon which the Board could have come to some reasonable conclusion as to the value of the stocks and bonds, and hence as to the cost to petitioner of the properties acquired; and we think the Board should have, on the facts, determined whether the whole purchase price of the 2,000 acres or some part of the purchase price allocable to the 300 productive acres should be adopted as the cost basis.

■ Second. Nor are we able to agree with the Board in its disposition of the second point set out above. The Board based its decision in this regard on the failure of petitioner to submit what the Board considered proper proof of the mineral content of the properties acquired by it. The proof which was made consisted of records showing that the company commenced business in 1923, and that between 1923 and 1930 it had taken from the 300-acre tract and crushed 328,877.85 tons of rock, and that the company's engineer estimated that the tonnage remaining in this tract in 1930 amounted to 170,000 tons. This evidence was—in a very real sense—indicative of the mineral content of the 300 acres at the time of its acquisition, and since the evidence showed that petitioner had determined that none of the remaining acres of the 2,-000 originally acquired contained merchantable asphalt, the proof as to the 300 acres was applicable to the entire Summit tract. The Board, however, said that this estimate was objectionable because, first, it was made at the wrong end of the period, and, second, it related to only a small portion of the Summit acreage. Since these were the principal grounds of the Board's holding, petitioner asked for a rehearing and for opportunity to produce the engineer who had formerly been employed by it and who could testify as to estimates of mineral content made at the beginning of operations, stating that he had not been available as a witness at the hearing before the examiner. The Board refused to allow petitioner to produce him, possibly because it felt that the inadequacies of proof in other respects would necessitate the same result in any event; but in the manner in which the record comes before us we think it was improper to deny the motion. As we have pointed out, petitioner's proof of mineral content, while probably sound in fact, was made as of 1930, whereas, in the Board's view, the estimate should have been made as of the beginning of operations. We do not need to decide—and hence do not decide—whether under the facts of the case such proof as petitioner

made might not be sufficient under the statute and regulations, for we think it better that the case should go back to the Board for fuller development so that any possible doubts in this regard may be removed. As to the other objection advanced by the Board—that the estimate related only to a small part of the Summit acreage—the answer seems to us to depend upon factors which the record does not fully develop. This point is closely related to the determination of cost, which we have discussed above. How the various properties were acquired, whether each lease is to be considered a separate property for cost and mineral content estimates, or whether groups of leases are to be the basis of computation, are questions which the Board must answer on the evidence. If the Board should find the fact to be that petitioner acquired the 2,000-acre tract as an entirety, taking the good with the bad, and that the total mineral content thereon at the beginning of operations was 500,000 tons, the Board will have no trouble finding the proper amount of depletion for the years in question. If, on the other hand, the Board should find as a fact that the 300-acre tract, which alone has been found to be profitable, is separable from the whole, and is to be treated as a "separate property" under the regulations in the computation of the various factors involved, it will arrive at depletion allowable to petitioner on that basis. But in either case it is obvious that there was depletion which when properly shown entitled petitioner to a deduction in its tax.

■ Third. As a last reason for disallowing depletion, the Board in its opinion says that there is no evidence of mineral *sold* in any year. This is a very technical and unsatisfying reason. The precise question was not asked any of the witnesses, but petitioner did show for each of the years in question, and indeed for every year from 1923 to 1930, the amount of tonnage produced each year, the amount shipped each year, and the amount in storage each year, and the difference between the amount produced and the amount shipped was the amount in storage. And it is perfectly obvious that petitioner considered that the amount shipped was the amount sold.

■ When to all of this is superadded the fact that after the Board's decision and in apt time petitioner asked leave to produce additional evidence to cover its default in evidence on the point mainly relied on by the Board, and was refused, it seems to us clear that the Board's decision to reject the entire claim is wholly unsustainable. Petitioner, as we think, has shown that the Commissioner's determination of its tax liability is excessive and that to sustain it would impose upon petitioner the duty of paying a tax that confessedly it does not owe. In similar circumstances the Supreme Court has said that the Board should hold the assessment arbitrary and invalid and should afford the taxpayer an opportunity to show whether a fair apportionment may be made and, if so, the correct amount of the tax. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

As we have indicated above, we think there is sufficient evidence in the record on which the Board could have made a reasonable estimate of some, if not all, of the factors upon which depletion is computed. And if it be said that the estimates would be only rough approximations it may be replied, as the Supreme Court said in United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054, that it is better to act upon a rough estimate than to ignore the fact of depletion. In view of petitioner's application for a rehearing and for an opportunity to produce evidence which was not available to it at the former hearing, simple justice requires that petitioner be granted further opportunity to present its proof. We, therefore, remand the cases to the Board with instructions to consider the testimony already taken and such further competent testimony as may be offered, to find the facts, and to determine the correct amount of the assessment on that basis.

Reversed and remanded.