DAVE RUBIN AND JENNIE FELDMAN RUBIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 45971. Filed September 20, 1956.

*Wentworth T. Durant, Esq.*, for the petitioners.

*Jackson L. Bailey, Esq.*, and *Frank C. Allen, Esq.*, for the respondent.

## OPINION.

TIETJENS, *Judge:* The first issue in this case involves the propriety of the Commissioner's disallowance of $2,329.52 in claimed business deductions for the year 1946 for lack of substantiation. The amount disallowed consisted of three items: Living expenses at the Herring Hotel in Amarillo, Texas, in the amount of $1,131.76; transportation expenses between Amarillo and Dallas, Texas, in the amount of $508.49; and "cash expenditures" in the amount of $689.27. Petitioners argue that these amounts represent ordinary and necessary expenses paid by them during the taxable year in carrying on their trade or business and thus they are deductible under section 23 (a) of the Internal Revenue Code of 1939.

The Commissioner determined that the living expenses incurred at the Hotel Herring were personal expenses and with this we agree. If travel expenses, including the entire amount spent for food and lodging, are to be deductible they must be ordinary and necessary and they must be paid or incurred by the taxpayer while away from home in the pursuit of his trade or business. Sec. 23 (a) (1) (A). Swenson, the accountant who prepared petitioners' income tax returns, testified that petitioners' home in 1946 was in Dallas and that they made several business trips to Amarillo that year. On the other hand, Rubin testified that in 1946 his home was in Amarillo. Also petitioners' 1946 income tax return, prepared by Swenson, gave an Amarillo address. Though the evidence as to residence is contradictory we have found that petitioners' home in the year 1946 was in Amarillo, not Dallas. Therefore, their expenses at the Hotel Herring in Amarillo were not deductible since not paid or incurred while away from home. They were personal expenses as the Commissioner had determined.

The Commissioner disallowed transportation expenses between Amarillo and Dallas for the year 1946 in the amount of $508.49. He determined that these represented personal expenses. We do not agree. Dave Rubin had business dealings in both Amarillo and Dallas during 1946. His testimony indicated that he maintained a business office in Dallas that year. He also testified that he traveled between Amarillo and Dallas on business during 1946. Twenty-four canceled checks, totaling $537.81, paid to the order of Braniff Airways Incorporated and drawn by Dave Rubin were also presented in evidence. The Commissioner argues that petitioners have not overcome the burden of proof that is placed upon them. In view of the evidence, we hold that the Commissioner erred in disallowing travel expenses in the amount of $508.49 for the year 1946.

Petitioner Dave Rubin drew many checks payable to the order of "cash" during the year 1946. He claimed that certain of them were spent on ordinary and necessary business expenses during that year and deducted them on his income tax return. The Commissioner disallowed these deductions to the extent of $689.27. Rubin testified that although he could read, he was unable to write any words other than "Dave Rubin" and "cash," hence the necessity for drawing his checks to the order of cash and not to specific persons. Petitioners introduced into evidence 27 checks totaling $873, drawn to the order of cash. On examination we find that 17 of these checks, totaling $530, had been cashed by Rubin at his own bank in Dallas, at a store called Morris Mens Wear in Dallas, or at the Herring Hotel in Amarillo. No other documentary evidence was introduced to substantiate petitioners' position. In view of the evidence, or lack of it, we hold that petitioners have not shown that the Commissioner erred in determining that "cash expenditures" in the amount of $689.27 were personal expenses and hence not allowable as deductions.

Petitioners argue that they are entitled to a deduction on their 1946 income tax return in the amount of $52,487.91 under section 23 (s) of the Internal Revenue Code of 1939 as a net operating loss carry-forward from the year 1944.

Section 23 (s) allows a deduction for a net operating loss as computed under section 122. The relevant provisions of section 122 are as follows:

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

(b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—

\* \* \* \* \* \* \*

(2) NET OPERATING LOSS CARRY-OVER.—

(A) Loss for Taxable Year Beginning Before 1948.—Except as provided in subparagraphs (D) and (E), if for any taxable year beginning before January 1, 1948, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the two succeeding taxable years, except that the carry-over in the case of the second succeeding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the intervening taxable year computed—

(i) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and

\* \* \* \* \* \* \*

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

(1) The deduction for depletion shall not exceed the amount which would be allowable if computed without reference to discovery value or to percentage depletion under section 114 (b) (2), (3), or (4) ;

\* \* \* \* \* \* \*

(4) Gains and losses from sales or exchanges of capital assets shall be taken into account without regard to the provisions of section 117 (b). As so computed the amount deductible on account of such losses shall not exceed the amount includible on account of such gains.

(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. For the purposes of this paragraph deductions and gross income shall be computed with the exceptions, additions, and limitations specified in paragraphs (1) to (4) of this subsection.

Petitioners sustained a net loss in the year 1944, which after being carried back to the years 1942 and 1943, and after being adjusted as provided by section 122(d), produced a net operating loss carryover in the amount of $52,487.91. Petitioners argue that since they sustained a net loss of $10,828.39 in the year 1945, then they need not adjust the carryover for any section 122(d) items used in computing the net loss in 1945, but may carry forward directly to the year 1946, the $52,487.91 net operating loss. This is the proper result, they argue, since section 122(b)(2)(A) only requires that the carryover be adjusted where there is net income in the intervening years and here there was a net loss.

We cannot agree with petitioners. Their argument ignores the plain language of the statute. Section 122(b)(2)(A) says in part that—

the carry-over in the case of the second succeeding taxable year shall be the excess, if any, of the amount of such net operating loss over the *net income for the intervening taxable year computed—(i) with the exceptions, additions, and limitations provided in subsection (d)(1), (2), (4), and (6).* [Emphasis supplied.]

The only logical interpretation we see for the above language is that in computing the amount of carryover for the second succeeding year, first the net income adjusted under section 122(d)(1), (2), (4), and (6) must be computed and then the net operating loss carryover must be applied against that net income as adjusted before it may be carried forward to the second succeeding year. In this case, petitioners sustained a net loss of $10,808.39 in the year 1945. In computing that net loss, petitioners deducted $2,520.43 for depletion and excluded from income, under section 117(b), capital gains of $75,076.75. When these amounts are added back to the net loss, then a net income, as adjusted under section 122(d), is produced in the amount of $66,788.79. Since the net operating loss carryover for the year 1945 is only $52,-487.91, then there will be no net operating loss carryover available for the year 1946, which is the year in question. Cf. *Bowers* v. *Commissioner*, 80 F. 2d 215 (C. A. 2, 1935).

Petitioners argue that even if they are not entitled to use the net operating loss carryover to reduce 1946 income, still there is no deficiency that year since they incurred a net loss in 1947 of $109,821.89 of which $99,401.98 was available as a carryback to the years 1945 and 1946 after adjustment under section 122 (d). And since only $14,-300.88 must be carried back to 1945, see *supra*, then $85,101.10 is available to reduce 1946 income. To prove the net loss for 1947, Swenson, the accountant, testified that he prepared petitioners' returns for the year 1947 and that it was based upon the books and records of petitioners regularly kept in their business and that in his opinion they correctly reflected income for that year. Swenson had these books in court with him, available for examination by the Commissioner. Petitioners introduced into evidence their income tax return for 1947, their application for tentative carryback adjustment, and their refund claim filed on Form 843. At the first hearing of this case, the Commissioner did not contradict the testimony or evidence, but argued that petitioners had not sustained the burden of proof which was cast upon them. Under these circumstances, we were of the opinion that petitioners had made a prima facie case that they suffered a net operating loss for the year 1947; however, they failed to show that such net operating loss resulted from the operation of a trade or business regularly carried on, which is a basic requirement. See sec. 122 (d) (5), *supra*, and *Lazier* v. *United States*, 170 F. 2d 521 (C. A. 8, 1948). On our own motion, for good cause, we set the case on the calendar for further hearing and ordered the parties to submit at that time, "either (1) An agreed computation showing the amount of any net operating loss carry-back from 1947; or (2) The amount of any such loss that *can* be agreed upon together with a specification of items that cannot be agreed upon; or (3) Further evidence regarding any regular trade or business carried on by the petitioners in 1947 and any net operating loss sustained in that year." Petitioners filed a motion to strike the case from the calendar and to have it decided on the record presented. We denied the motion. At the rehearing petitioners renewed the motion on the basis that they thought that adequate evidence had been submitted for a determination. They declined to offer any more evidence until the Commissioner made a case, though they contended that they retained the right to rebut it if the Commissioner went forward with the evidence. Whereupon the Commissioner called an Internal Revenue agent who testified that he had examined petitioners' income tax returns and books and records for the years 1947, 1948, and 1949, and that they revealed that petitioners had not sustained a loss in the year 1947, but on the contrary had taxable income of $91,412.50. This determination was mainly

based on the agent's finding that petitioners realized gain in the amount of $272,520.94, one-half of which was long-term capital gain and one-half of which was short-term capital gain, on a transaction that Dave Rubin entered into with G. E. Hall and Joe Stewart on April 5, 1947, instead of an ordinary loss of $8,208.76 as they reported in their 1947 income tax return. The discrepancy on that transaction resulted from the agent's finding that Rubin's adjusted basis in the property sold to Hall and Stewart was $212,744.56 and not $493,474.26 as petitioners claimed. The Commissioner allowed only one-half of Rubin's basis against the consideration received on the sale, which petitioners' books and income tax return for 1947 showed to be $485,265.50, since Rubin only sold an undivided one-half interest in the property; and he also made other minor adjustments in the basis.

Petitioners, on cross-examination of the agent, attempted to show error in his findings. First, they asserted that it was incorrect to find that one-half of the gain on the Rubin-Hall-Stewart transaction was short-term capital gain, since at the time the contract was entered into, Rubin only owned one-half of the property and did not acquire the other half until July 29, 1947, in a partition suit. Hence when the sale took place on April 5, 1947, Rubin sold all of the property he held at that time and did not sell any of the property subsequently acquired. Secondly, they asserted that it was error not to allow a deduction to Rubin for one-half of the intangible drilling costs incurred by Hall and Stewart in carrying out the contract as a deduction in computing 1947 income. And thirdly, they asserted that Dave Rubin's books were incorrect and that none of his debts were discharged by Hall and Stewart in 1947 and hence income was overstated by $485,265.50.

Petitioners' objections may be disposed of quickly. Prior to entering into the agreement with Hall and Stewart on April 5, 1947, Rubin had acquired from Milton Rosenblume, Miriam Emmer, and Mannie Jack Rubin the undivided one-eighth interest which each owned in the properties in question except for certain overriding royalties. Also, Rubin held a power of attorney over the other undivided one-eighth interest. The decree of partition stated that Rubin was thereby vested with the 4 above-mentioned one-eighth interests; however, as to 3 of the one-eighth interests, this merely was an echoing over of a prior acquisition. Hence at the time that Rubin made the agreement with Hall and Stewart, he owned seven-eighths of the properties and held a power of attorney over the other one-eighth. The Commissioner concluded that Rubin sold one-half of the properties which he originally owned and one-half of the properties which he subse-

quently acquired or held a power of attorney over. Petitioners have not shown that this conclusion was incorrect and hence we uphold the Commissioner.

When this case was first heard petitioners did not attempt to prove the amount of intangible drilling costs which were charged to Rubin and which it is now argued are deductible items. Nor did they attempt to prove that the entries on Rubin's books, which indicated that his debts had been discharged by Hall and Stewart in 1947 in the amount of $485,265.50, were incorrect. Instead they asserted that the tax return for 1947 was correct as filed and that it was based on Rubin's books which had been regularly kept in his business. At the outset of the rehearing, petitioners, when given the privilege of doing so, declined to introduce any more evidence in regard to their 1947 net operating loss. After cross-examining the revenue agent, however, petitioners offered the testimony of Hall's, and Stewart's regular accountant, one Masco, in order to show (1) the amount of intangible drilling costs which they claimed to be deductible by them in 1947, (2) the 1947 gross income from the properties involved in the April 5, 1947, contract, (3) the operating expenses for those years, and (4) the abandonment loss taken by Hall and Stewart that year. These, petitioners argue, would show that Rubin received no income in 1947 as a result of the Rubin-Hall-Stewart agreement. We denied petitioners the right to introduce this evidence, holding that it would not be in rebuttal of the Commissioner's evidence but would be new matter relating to the 1947 net operating loss and that petitioners had waived their right to introduce such evidence.

Petitioners have not shown the intangible drilling costs incurred by Hall and Stewart in 1947 and chargeable to Rubin. Therefore, even though these might be deductible items, we cannot allow them.

Petitioners argue that no income was realized by Dave Rubin in 1947 when he entered into the contract with Hall and Stewart; that no income was realized by Rubin in 1947 when Hall and Stewart paid debts of his in the amount of $750,000 since the debts were not discharged, i. e., Rubin now owed the $750,000 to Hall and Stewart instead of to his former creditors. In spite of this we still find that Rubin realized income in 1947 in the amount of $485,265.50 as a result of the contract. His books and records show that that amount of his indebtedness was discharged and it was so reported on petitioners' income tax return for 1947. The agent testified that he examined the entries on the books relating to this, that he secured a list of the debts discharged, and that he talked to Rubin and his bookkeeper about it and satisfied himself "that it was the facts." Hall testified that he and Stewart had "taken up" Rubin's indebtedness pursuant to the contract in 1947 by paying

Rubin's indebtedness. Petitioners also asserted several times that Rubin's books and records were properly kept and were correct. The discharge of Rubin's debts was income to him. See *E. F. Simms*, 28 B. T. A. 988, 1030 (1933). The fact that the grantees held the amounts of the indebtedness discharged under the agreement "as a charge or incumbrance against the oil and one-half of the gas" to be produced from the properties would not change the result. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417 (1932). The only evidence produced by the petitioners to show that none of Rubin's debts were discharged by Hall and Stewart in 1947 was Rubin's own self-serving testimony. This is not sufficient to overturn our above finding. The legal effect of the transaction was to discharge Rubin individually of his debts.

We need not consider how petitioners' 1947 income was affected as a result of the operation of the properties involved in the Rubin-Hall-Stewart agreement of April 5, 1947, since no evidence was presented on this issue.

We recognize that disposition of this case may appear to have been postponed for an inordinate length of time from the date of the original hearing. This was occasioned, however, by representations of the parties from time to time that if additional time were available, complete audits could be made of the 1947 return and a settlement of the main issue could be agreed upon. This did not eventuate and the Court was of the opinion that an opportunity for further hearing would be necessary before a proper disposition of the case could be made. This opportunity has been afforded the parties, with the foregoing result.

*Decision will be entered under Rule 50.*