Dave RUBIN and Jennie Feldman Rubin, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16577.

United States Court of Appeals Fifth Circuit.

Feb. 6, 1958.

Wentworth T. Durant, Robert J. Hobby, Dallas, Tex., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Davis W. Morton, Jr., Abbott M. Sellers, Attys., Dept. of Justice, Nelson P. Rose, Chief Counsel, Internal Revenue Service, Claude R. Marshall, Special Atty., Washington, D. C., for respondent.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Tax Court held that with respect to a now admitted deficiency of $14,418.-51 for 1946 income taxes, the Taxpayer failed to establish the claimed loss-carry-back deduction, 26 U.S.C.A. §§ 23(s), 122, for 1947. This review presents substantive questions concerning the nature and tax incidence of the underlying transaction, but in the view we take of the case, we need not pass on them at this time. Since our disposition is a procedural one remanding the case for further hearing, only a sketchy outline of the facts is warranted.

### The Rubin Ownership

Dave Rubin and wife, Jennie Rubin, were owners of extensive productive oil and gas leases and working interests at the time of the wife's death on January 11, 1942. Upon her death, Dave was the owner of an undivided ½ interest and the

remaining ½ was owned in three equal shares of ⅛ by each of the surviving adult children and ⅛ by three minor children of one daughter who had predeceased Mrs. Rubin. Dave, through one form or another, without success, undertook to operate these properties as an informal partnership of himself, the three children, and the three grandchildren. By 1947, operating debts totaled nearly $750,000. The economic exploitation of the properties required adequate financing and management. To achieve this, apparently it was deemed advisable to concentrate ownership of working interest in Dave and eliminate such ownership by the children. By March 16, 1947, through mutual exchange of deeds, Dave had acquired, for a small cash consideration and the reservation of specified overriding royalties, all of the interest (⅜ths) of the adult children. The remaining ⅛ held by the minor grandchildren was obtained by a state court friendly partition suit filed March 16,

1947, with the final decree entered July 29, 1947, confirming a like disposition.

## The Hall-Stewart Transaction

On April 5, 1947, a formal contract carrying out the earlier letter of intent of March 17, 1947, was made between Hall and Stewart and Dave, then the owner of ⅞ of the working interest with the expectation of soon acquiring the minors' ⅛ interest. After reserving certain gas operations, Rubin conveyed and assigned a ½ interest (¼ to each) to Hall and Stewart. In consideration of the transfer, Hall and Stewart agreed to refinance [1] Dave or purchase his outstanding debts up to $750,000, to carry out a specified drilling program for 100 wells, and to manage and operate the properties in a prudent and businesslike way. Elaborate, precise provisions were made [2] concerning the application by Hall-Stewart of proceeds from oil and gas to effectuate the declared [3] general purpose that

1. "13. * * * (a) As consideration for the foregoing grant * * * and conveyance, * * * [Hall-Stewart], grantees, agree and promise Dave Rubin, grantor, that they will refinance grantor to the amount of $750,000.00, or to the amount of his indebtedness as of April 1, 1947, whichever amount is the smaller, by taking up, either directly or through Dave Rubin, such indebtedness as is owing by Dave Rubin or stands as charges or incumbrances against the property described * * *, and that grantees will hold the amount of such indebtedness, after taking it up, as a charge or incumbrance against the oil and one-half of the gas to be produced * * *, until the full amount of such indebtedness so to be taken up shall be repaid to the grantees in the following manner: * *."

2. Proceeds from all oil runs plus Hall-Stewart's ½ interest in gas proceeds were to be used: first for the payment of landowner's and overriding royalties; next, to reimburse Hall-Stewart for (a) operating costs and for (b) the full amount they might expend "in taking up grantor's [Dave's] * * * indebtedness" and (c) thereafter until they were reimbursed for drilling and equipping the first 50 wells at a stated price of $26,500 per well. After payment of these items,

the remaining proceeds were to be used by allocating 25% to the Operating Fund and 75% to the Drilling Fund, to be expended on further development in the discretion of Hall-Stewart. After such prior amounts had been paid, Dave was to receive ½ of the amounts coming into the Drilling Fund for his own account and ½ of Hall-Stewart's ½ of the Drilling Fund until out of the latter he had been paid $2,550,000 expressly described as the "consideration to grantor [Dave] for making this grant, sale, assignment, and conveyance."

3. This was stated in one of the inducement clauses:
"* * * to the end that all * * * provisions of the oil and gas leases under which the said Dave Rubin holds title * * * shall be complied with, and that ultimately the * * * property shall be fully developed for oil and gas, and to the end also that the one-half of the property retained by Dave Rubin * * * shall be charged with one-half of the total costs and expenses incident to the management and operation and development of such entire property and be entitled to an equal one-half of the profits of the entire property, and that the one-half of the property conveyed * * * [Hall-Stewart] shall be charged

Dave's reserved ½ interest would share equally in expenses and operating profits.

Hall-Stewart then "took up" or "paid off" Dave's debts [4] in a total referred to roughly as "about $750,000" but probably more nearly in the amount $485,265.50 shown on Dave's books as the amount received for the sale of the ½ interest to Hall-Stewart. In Taxpayer's 1947 return, this amount was likewise treated as income, although it there had no definitive tax consequence since the adjusted basis of the property sold was fixed at $493,474.26 resulting in an unrecovered loss of $8,208.76. This added to other operational losses brought the total loss [5] in the 1947 return to $109,821.89.

It was this 1947 loss, as adjusted, which Taxpayer in the Petition for Redetermination of the 1946 deficiency, contended had completely extinguished liability for any further payments.

### The First Hearing

The first hearing was held October 23, 1953, before Judge Tietjens who, three years later, September 20, 1956, delivered the opinion for the Tax Court, 26 T.C. 1076.

On this issue of the 1947 loss carryback, Taxpayer quickly presented a simple case. Through the certified public accountant who had long prepared Taxpayer's returns and who was generally familiar with the Taxpayer's basic books

and records then available in the courtroom for inspection or for use as a foundation for cross examination, the 1947 return was established as correctly reflecting income and expenses and the net income or loss for that year. The return was offered as an exhibit, as were other adjustments, and using these exhibits, the accountant positively [6] fixed the loss at the sum indicated, $99,401.98. Taxpayer then offered the "no-change" letter of April 4, 1952 sent to him by the Dallas Agent in Charge stating that upon examination of the returns for 1947, 1948 and 1949, "the conclusion has been reached that it (they) should be accepted as filed."

The Commissioner's counsel stood mute. He declined cross examination of the accountant and rested his case without offering any evidence. Time for briefs on the merits was fixed. The case was closed.

But not for long. For three days later (October 26, 1953), the Commissioner sought leave to reopen the case to receive evidence showing that the "no-change" letter was wrong and had been sent in error. This, it was stated, was because Revenue Agent Noah's examination showed a net *income* for 1947 of $98,090.31, but that no deficiency was set up for 1947 because extensive admitted losses in 1949 operated as a loss carry-

---

with the operation and management of said entire property and with an equal one-half of the total costs and expenses incident to the management, operation, and development of said property, and be entitled to an equal one-half of the profits of such entire property."

4. The Tax Court held that this was a release of Dave's personal liability and hence income in the year (1947) in which the debts were discharged. Taxpayer contends that the debts were not extinguished but were merely transferred from the individual outside creditors to Hall-Stewart by assignment, and since Dave's ½ interest remained subject to the charge, see 1, supra, there could in no event be income until oil-gas runs were so used. It is uncontradicted that no oil payments were thus applied by

Hall-Stewart in 1947. We do not pass on this basic issue.

5. In the petition for Review of the Notice of Deficiency for 1946, this asserted 1947 loss carry-back was adjusted to $99,401.-98.

6. Except that the Commissioner objected to the accountant's stating this opinion, which objection the Tax Court promptly overruled with no subsequent action preserving any error, the Commissioner offered no objection to the accountant's testimony that these books were kept in the regular course of business nor to the use or formal introduction of the returns as a convenient tabulation by the witness of the Taxpayer's income record. Indeed, at the Commissioner's request, the returns were marked as a joint exhibit.

back to wipe out any 1947 deficiency.[7] After further colloquy, both Taxpayer and Commissioner agreed to expunge the letter provided the record was considered closed and the case submitted.[8] Briefs on the merits were thereafter submitted on schedule.

The upshot of this was that on the *amount* of the 1947 loss, the Taxpayer's case was unchallenged. Nothing stood against it except the remarks of counsel, note 7, supra, that Agent Noah would testify that the 1947 return was wrong and showed a substantial income, not loss. But Agent Noah had never yet testified.

### The Order for Further Hearing

On May 27, 1954, Judge Tietjens "on the Court's own motion" ordered[9] the case set for further hearing, requiring the parties to submit either an agreed computation, the amount of losses upon which agreement could be reached, or further evidence on the net operating loss sustained and the "regular trade or business carried on by" the Taxpayer.

Following this the case was continued from its June 14, 1954, setting by joint agreement, although the brief hearing

revealed that little else was agreed on, and already the Taxpayer was beginning to sound[10] what was to become the recurring theme that Judge Tietjens neither did, nor could, call for further hearing as the Taxpayer had made out a prima facie case.

In the meantime, two years rolled by in which extended, but unfruitful, negotiations were carried on by counsel. When, with the next docket notice fixing the hearing date for March 1956, it began to appear quite definitely that Taxpayer was misreading the order for further hearing, note 9, supra, Taxpayer, on January 19, 1956, filed a motion to strike the setting " * * * and to decide the case in accordance with the evidence and the briefs of both parties previously heard and received." It was promptly overruled by a formal order of Judge Tietjens which made clear that the additional matter called for in the May 1950 order, note 9, supra, should be supplied by proof or stipulation or both.[11]

### The "Further Hearing" Before Judge Black of March 1956

On the docket called March 12, 1956, with Judge Black presiding,[12] the Taxpayer again labored at length his con-

7. In view of what happened two years later, the following colloquy is significant:
"The Court: Well, if I permit the proceeding to be reopened, what evidence do you intend to offer?
[Commissioner's Counsel]: "Well, I have the Revenue Agent, and I intend to allow him to testify as to the result of his examination as to the year 1947 * * *."

8. Taxpayer's counsel: " * * * provided this case remains closed, you can expunge that letter from the record."
Commissioner's counsel: "If [Taxpayer] will agree to withdraw that from the record, we will let the case go as submitted."

9. "Further Ordered: That the parties submit at that time, either
"(1) An agreed computation showing the amount of any net operating loss carry-back from 1947; or
"(2) The amount of any such loss that can be agreed upon together with a specification of items that can not be agreed upon; or

"(3) Further evidence regarding any regular trade or business carried on by the petitioner in 1947 and any net operating loss sustained in that year."

10. Taxpayer's counsel: " * * * I don't interpret Judge Tietjens' order as setting this case on this docket for further testimony. I understand it was set back on in order to stipulate certain facts, but I don't think the Order, as stated, would indicate further evidence should be taken."

11. The order stated, in part:
" * * * In order to facilitate a decision in the case the Court entered an order on May 27, 1954, recalendaring the case for the taking of additional testimony or the filing of stipulations with reference to specific points enumerated in the order."

12. Not the least of the difficulties in the case is the fact that the March 1956 Dallas docket was heard by Judge Black whose knowledge of this case, apart from counsel's prolix oral presentation, was

tention that there was nothing to hear. But, adding to the general confusion [13] and ambiguously in contrast to his earlier and subsequent position, he acknowledged [14] that he would likely have to proceed with further evidence, the nature of which must have been known since he estimated that his proof would take about two hours.

Came then four days later the hearing and, at the outset, another rehash *pro* and *con*, 14 pages of printed record, of taxpayer's insistence that he had made his proof and was entitled to judgment, favorably he hoped, but in any case, a decision. The Commissioner, construing the order, note 9, supra, as a suggestion by Judge Tietjens to Taxpayer that the "closed" record was inadequate and an invitation for him to supply deficiencies either by stipulation which had failed or by evidence, did outline in considerable detail the proof he said he was about to offer through Revenue Agent Noah. Briefly it was: on the Agent's examina-

tion of the 1947 return, it was found incorrect but no deficiency notice was made in view of the 1949 loss carry-back; instead of the loss, as shown on the return, there was net income in excess of $92,-000; this difference came from the fact that, whereas Taxpayer treated the "proceeds" ($485,265.50) as a recovery of the adjusted basis ($493,474.26) for the *whole* ownership [15] of the mineral properties, the Hall-Stewart contract conveyed only a ½ interest, so that the corrected adjusted basis of $212,744.56 should be used.

Judge Black so interpreted the situation.[16] And then, apparently abandoning his proposed plan of action indicated four days earlier, note 14, supra, Taxpayer in a display of great confidence inspired perhaps through a sort of self-mesmerism from his own argument, announced the bold course that "If this Court has scheduled it for rehearing, we decline to put on any more of our case in chief." This was coupled with the position [17]

---

confined to the record file of the petition, answer, order for further hearing, motion to strike and order denying it, since he had not seen or read the transcript covering the first hearing.

13. Taxpayer's interminable elaboration of the dominant theme must have created the impression, inherently repugnant to the Tax Court's concept of its function, that the whole business was a sort of cat and mouse game in which parties through the use of procedural rules and burden of proof could force the judge to undesired action. See, e. g.:

Taxpayer's counsel: " * * * If Judge Tietjens was not satisfied with petitioners' evidence, all he had to do was to hold against us, but he hasn't done that, Your Honor, and we think that he is going beyond his duty as a Tax Court Judge in putting this back on the calendar for further trial. After all, what does he want in the evidence; whose evidence does he want?"

14. Taxpayer's counsel: " * * * if our motion should again be overruled and we would be put to trial, we see no alternative but to perhaps present additional evidence * * *."

" * * * Of course, if this Court indicates that the respondent [Commissioner] shall now have an opportunity to

put on evidence, then we believe perhaps a fuller record would have to be made by us and we will have to offer additional evidence."

15. This is another substantive issue which we bypass at this time.

16. Judge Black: " * * * it would be my interpretation that Judge Tietjens has set it down so as to give the taxpayer the privilege of proving that a net loss carry-over if he's got one, because if it wasn't set down for that purpose, it would be difficult for me to know what purpose it is set down for. He apparently didn't want to say, 'Well, you are not entitled to any net loss carry-over because you haven't proved any.' * * * so that if the taxpayer can prove he has any carry-over, Judge Tietjens will receive the evidence."

This was restated several times.

17. Taxpayer's counsel: "Well, if the Court please, meaning no disrespect to Judge Tietjens, I still reserve the right to put on my own case without instructions from Judge Tietjens as to how to do it.

"My position is simply this * * * we have never asked for any additional time in Court * * *. [I]f the respondent cares to go ahead and offer

that if the Commissioner made "a case," Taxpayer would "have the right to rebut it." But contrary to the Tax Court's later finding [18] and the contention pressed so hard here by the Commissioner, there was certainly no *voluntary* "waiver" of Taxpayer's right to put on relevant evidence. The Commissioner's remarks attempted to create one, but the implication was instantaneously rejected by Taxpayer and in no sense was it then given an imprimatur by the judge.[19]

Agent Noah's direct testimony and exhibit schedules offered with it bore out counsel's proffer. It showed, too, that Noah's data and conclusions had come not alone from his examination and consideration of Taxpayer's 1947 return, but also of outside sources including Taxpayer's books and records and the partnership information return for 1947 down to the date of dissolution of the family estate partnership. By this direct examination, the Commissioner had at long last made proof that the 1947 return was incorrect, and that Taxpayer had in fact a net income in excess of $92,000. It was the latter fact which was material and the issue in dispute.

As his opening volley on cross examination, Taxpayer put the question whether the Agent had really sought to reconstruct the true picture of net income or

loss or had merely been looking for items to disallow from the 1947 return. Because of an objection by the Commissioner, this and similar questions were not allowed. But it became evident that the agent either had not sought to reconstruct the income picture or, on his interpretation of legal principles, he had rejected ascertainment of several items. Specifically, he acknowledged that he had not computed any income to Taxpayer from the Hall-Stewart operations except to verify that no oil run proceeds had been applied in reduction of the charge against Taxpayer's ½ interest for the debts "paid" by Hall-Stewart. He had not determined the operating expenses disbursed by Hall-Stewart in management of the properties, had not ascertained the gross or net proceeds received by Hall-Stewart from oil produced by the properties in 1947, and had made no deduction for intangible drilling costs which might be attributable to Taxpayer as an owner of ½ of the working interest.

The Commissioner, on this and the testimony of Hall (of Hall and Stewart) subsequently received by agreement, then rested. Taxpayer then offered proof, both from the attorney who prepared the Hall-Stewart papers and Taxpayer personally concerning the mechanics of the

---

some evidence on his own behalf, of course, he is entirely welcome to do so. * * * [W]e are not going to offer anything until they make a case."

Judge Black: "Yes, well, that, of course, is your privilege that you do not have to offer evidence unless you see fit to do so.

"Now you now announce you do not wish to go forward with any evidence in response to setting of the case down for rehearing.

*      *      *      *      *

Taxpayer's Counsel: "I don't mean that, Your Honor, I mean this, if respondent goes forward, we contend we have the right to rebut it, but if he does not go forward, we don't intend to put on any additional evidence."

18. The opinion, 26 T.C. 1076 at page 1086, stated:

"We denied petitioners the right to introduce this evidence [intangible drilling costs, see infra], holding that it would not be in rebuttal of the Commissioner's evidence but would be new matter relating to the 1947 net operating loss and that petitioners had waived their right to introduce such evidence."

19. Commissioner's Counsel: " * * * it would appear to the respondent * * * that the petitioner has waived his right for the record to put on any witnesses for the examination to adduce any part of this record. Then the respondent takes the position and thinks that the Court should agree with him on the point that, having taken that position, he is limited to cross examination of the respondent's witnesses."

Taxpayer's counsel: "I don't think that's right, Your Honor. We are entitled to rebut."

payment of the creditors. On seeking further to develop proof through Taxpayer as a witness concerning intangible drilling costs under the Hall-Stewart operation, the case again lapsed into the state which had so often plagued it with long extended argumentative objections and responses which leaves us, as it must have Judge Black, in a condition of obfuscation. The precise objection to this testimony from Dave Rubin was either sustained or lost in the fog, and after endless words, Taxpayer made a formal proffer. [20] As a part of this and to add to the general bewilderment Taxpayer then swung one hundred eighty degrees to contend that the 1947 return whose infallible accuracy had been extolled by him on all occasions as he pressed the claim of a "prima facie" case was after all wrong in not showing deductions for these intangible costs and in treating the debt "payment" as income.

Eighteen pages later, after first stating that he would receive it,[21] Judge Black, apparently quite concerned because Taxpayer had not taken these attributable intangible drilling costs on his 1947 return, finally ruled that all Tax-

payer could do was rebut, not the Commissioner's defense, but Noah's specific testimony, and rejected these proffers [22] as not being in rebuttal.

### The Tax Court's Decision

On September 20, 1956, Judge Tietjens announced the opinion for the Tax Court and from it was learned [23] that Taxpayer and Commissioner were each right and each wrong, as was Judge Black, in the effort to divine the purpose of the order for further hearing, notes 9, 11, supra. The Taxpayer was right that he had proved prima facie a *loss;* the Commissioner was right that Taxpayer had failed to prove, as Section 122(d) (5) required, that the 1947 loss was incurred in the "operation of a trade or business regularly carried on by the taxpayer * * *."

After briefly summarizing the complicated activities of these hearings, Agent Noah's testimony and Taxpayer's criticism of it, the Court disposed of two issues on the merits. As to the third contention, that ½ of the intangible drilling costs should have been allowed, the Court summarized [24] the developments, recog-

---

Judge Black: "We will get to that feature when we come to it."

20. Taxpayer's counsel: · ·   *   *   we propose on rebuttal in answer to the respondent's attempt to prove that we had income in the year 1947, taxable net income instead of a net operating loss * * to prove that the respondent's computations of income were in error for any one of a number of reasons, and in rebuttal we also propose to offer proof in the form of facts and figures indicating the exact amount of income, we believe, or loss we believe chargeable.

21. Judge Black: "I think I will hear you, although I think you should have done that to start with, if that's what you are going to try to do. You should have done that to start with, but the Court is anxious to get the facts.
"Now, I guess we will have to hold the hearing tomorrow because the Court can't go on all day."

22. Taxpayer's counsel learned during the direct examination of Agent Noah that Hall-Stewart's accountant (Masco), initially under a subpoena duces tecum requested by the Commissioner, would not

be used as his witness. Masco, then subpoenaed instanter by Taxpayer, was available outside the courtroom with Hall-Stewart's books and records and through him, Taxpayer proposed to prove: "One is the gross income from these properties in 1947, second the abandon loss taken by Hall and Stewart in the year 1947 and third, the operating expense in 1947 and fourth, the amount of development cost that should have been written off in that year."

23. 26 T.C. 1084: "At the first hearing of this case, the Commissioner did not contradict the testimony or evidence, but argued that petitioners had not sustained the burden or proof which was cast upon them. Under these circumstances, we were of the opinion that petitioners had made a prima facie case that they suffered a net operating loss for the year 1947; however, they failed to show that such net operating loss resulted from the operation of a trade or business regularly carried on, which is a basic requirement."

24. "When this case was first heard petitioners did not attempt to prove the

nized that the Taxpayer was seriously asserting that the proffered Masco testimony " * * * would show that Rubin [Taxpayer] received no income in 1947 as a result of the Rubin-Hall-Stewart agreement," confirmed [25] the ruling made by Judge Black during the second hearing, and then made plain that it was not reaching the merits because the Taxpayer had not proved what he sought to prove:

> "Petitioners have not shown the intangible drilling costs incurred by Hall and Stewart in 1947 and chargeable to Rubin. Therefore, even though these might be deductible items, we cannot allow them.

> \* \* \* \* \* \*

> "We need not consider how petitioners' 1947 income was affected as a result of the operation of the properties involved in the Rubin-Hall-Stewart agreement of April 5, 1947, since no evidence was presented on this issue."

After the original opinion was delivered, the Tax Court overruled Taxpayer's formal request for further hearing to produce this testimony which the Court found lacking.

### Our Disposition of the Case

We decline, as urged by Taxpayer, to rule on the merits of any of these substantive questions. On a record that patently does not contain probably relevant facts, we would compound confusion either to rule now or express anticipatory opinions as the case wends its way back here. We emphasize this so that these inveterate contenders who have already exhausted three years in divining Judge Tietjens' 1954 order may not take aid or comfort in anything said or unsaid by us in attempting to recreate in a few pages

the verbal turmoil, the recitation of which consumes the first thirty-eight pages of Taxpayer's brief and the first forty-seven in the Commissioner's.

■ This, too, would apply as to the procedural-substantive question of burden of proof where the finding (1946 deficiency amount), armed with the Commissioner's presumption of correctness, is not really attacked and the Commissioner has made none on the loss to be carried back (1947). Engaging arguments are made *pro* and *con*, but in a record confessedly lacking in available facts which a party sought to introduce, we ought not to express an opinion as to where it rests or whether it has been met until that record is corrected and made complete.

But we think that as wide as must be the considered judgment and discretion of the Tax Court in its control of the actual progress of a trial, the exclusion of the proffered evidence and the denial of the motion to reopen the case for additional testimony was, under these circumstances, a procedural error fraught with decisive substantive consequences of such a nature that justice requires that it be corrected. Stock Yards National Bank v. Commissioner, 8 Cir., 153 F.2d 708; Ohio Valley Rock Asphalt Co. v. Helvering, 68 App.D.C. 176, 95 F.2d 87; Polizzi v. Commissioner, 6 Cir., 247 F.2d 875; Commissioner of Internal Revenue v. Wells, 6 Cir., 132 F.2d 405.

And here we are careful not to lapse into the Taxpayer's analysis which seeks to determine all in terms of whether, as a matter of law, the Taxpayer had or had not made out a prima facie case on the first hearing.

■ We think, as did the Tax Court, that he did in part and failed in part. We do not consider though that the Tax

---

amount of intangible drilling costs which were charged to Rubin and which it is now argued are deductible items. * * * At the outset of the rehearing, petitioners, when given the privilege of doing so,

declined to introduce any more evidence in regard to their 1947 net operating loss * * *."

**25.** This is set out in footnote 18, supra.

Court, any more than a traditional tribunal, must perforce have used the drastic device of a dismissal on the merits. When it thought the facts were inadequately presented but probably available, it had the right to reopen the case on its own motion, and this it did, as it plainly said.

But while the holding of a prima facie case was not decisive, it is not altogether without some significance. Except for the almost formal matter of the Section 122(d) (5) regular trade or business issue which was quickly cured by Taxpayer's personal testimony on the second hearing, the Court now makes plain that until the Commissioner came along and offered controverting evidence, the Taxpayer had made out a case showing the 1947 loss. Unless Taxpayer's evidence had that effect, it would be ascribing to the Tax Court a careless, incorrect use of the phrase "prima facie case," a term of art well known to the law, lawyers, and judges.

■ In the posture of the case at the commencement of the hearing before Judge Black, there had yet been nothing but counsel's statements showing why the 1947 return was in error. Was the Taxpayer required to anticipate that such proof finally would be made? The Commissioner on the first hearing two years before had said he would prove it, note 7, supra, but had not done so and had even closed the case without it. Perhaps prudence now suggests that Taxpayer ought to have seized the invitation so often and earnestly extended by Judge Black to offer whatever evidence he had or could think of either to refute or offset the consequences of whatever the Commissioner might [26] soon offer. We can, also readily sympathize with Judge Black whose efforts to seek light and find a

solution seemed always to be obscured by oral inundation, much of which was inconsistent with that spoken before or after. But we could certainly not hold that in the confusion, created in part by natural uncertainty in the mind of the presiding judge unfamiliar with the whole case, the action of the Taxpayer in adopting a wait-and-see attitude was so unreasonable as to bring down on him the loss of valuable, potential rights. Especially is this so when the only real reason which the Commissioner could advance in asserting his objections was that if the Taxpayer was " * * * going to try this case the way he now indicates, we could go on here for two or three days * * * ."

■ Moreover, the interpretation placed on "rebuttal" was in these circumstances hypercritical and unrealistic. It meant something more than the opportunity to refute merely piece by piece that which the Commissioner's witnesses would state. It bears repeating here that when the Commissioner commenced his case two years later, the Taxpayer had made out a showing of a loss in sufficient amount to extinguish the 1946 deficiency. When the Commissioner finished, he had, if the testimony were ultimately credited, overcome the Taxpayer's case by proving that no loss had been sustained. The thing to refute or rebut then was not the series of evidential facts which went to make up the conclusion of no loss. It was, rather, the basic thing—proof of no loss where previously this had been unchallenged.

■ Likewise, if approached from a technical evidentiary point of view, this conclusion has additional support. The essence of the testimony from Taxpayer's accountant witness was that the 1947 return correctly reflected the Taxpayer's

26. For example, see note 23, supra, concerning the discovery that Masco would not be called as a witness for the Commissioner. Was Taxpayer to be penalized if, through this undisclosed development, his strategy or tactical planning to develop intangible drilling costs facts by cross examination of this witness was rendered impossible?

net income and loss. On the other hand, the thrust of the Commissioner's testimony was that the return could not be used either itself or as a convenient summary. Since Agent Noah in arriving at his conclusions admittedly used other materials and sources, it was relevant and probative for the Taxpayer to establish, if he could, that by resort to *other* outside and extraneous materials the true income or true loss was something else. Once the Commissioner's witnesses departed from data reflected solely in the 1947 return itself, the bars were down to receive, as rebuttal to this approach, relevant competent evidence which had a bearing on the reconstruction of the true picture.

Whether the Hall-Stewart transaction permits deduction of these attributed intangible drilling costs and related items, or whether the facts will show them in significant amounts are matters which are or may be decisive and which are committed to the Tax Court for determination in the first instance. With the facts waiting anxiously on the threshold, the Court should have left the door open, or having mistakenly closed it, the Court ought to have reopened it when the Taxpayer knocked again.

The final judgment and order of the Tax Court insofar as it relates to the 1947 loss carry-back is therefore vacated and the cause remanded for further hearings and a new decision. At this preoccupation with questions of burden of proof and whether matters are, or are not, in rebuttal or constitute new proof has so dominated the whole case and has undoubtedly influenced both Commissioner and Taxpayer in the strategic or tactical use of given testimony, we think that a full development of a record requires that each party be free to offer in addition to that contained in the present record whatever relevant and competent evidence there may be on all of the issues in this case related to the 1947 loss-carry-back.

Reversed and remanded.