MANAHAN OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

G. A. MANAHAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

R. D. CREIGHTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PEARL V. MANAHAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9669, 9664, 9666, 9668.   Promulgated May 29, 1947.

*C. H. Rosenstein, Esq.,* for the petitioners.
*Frank B. Schlosser, Esq.,* and *L. R. Van Burgh, Esq.,* for the respondent.

### OPINION.

MURDOCK, *Judge*: The Commissioner determined deficiencies of $6,316.80 and $1,459.21 in the income tax of the Manahan Oil Co. for the fiscal years ended June 30, 1940 and 1941. He also determined liabilities against the other three petitioners as transferees. The three individual petitioners concede that they are liable as transferees for any amounts due from the corporation. The latter will be referred to hereinafter as the petitioner.

The issues for decision are whether the Commissioner erred, first, in disallowing deductions taken by the petitioner for intangible drilling and development costs of oil wells and, second, in adding to the income of the petitioner amounts received for oil from fractional interests in leases assigned to the petitioner only until it was reimbursed for its drilling and development costs. The facts have been stipulated and the stipulation is adopted as the findings of fact.

The petitioner filed returns for the periods here involved with the collector of internal revenue for the district of Oklahoma.

The Shasta Oil Co. owned a seven-eighths working interest in an oil and gas lease, called the Carlock lease, covering about 120 acres of land in Texas. The petitioner acquired an interest in the Carlock lease under a written contract with Shasta dated April 21, 1939. Shasta was described in the agreement as the vendor and the petitioner as the

vendee. The agreement recited that the vendor desired to have the property developed for oil and gas and the vendee was in a position and desired to develop the property. The vendor conveyed to the vendee an undivided one-half of its seven-eighths interest in the leases and the vendee paid the vendor $37,639.25. The vendee agreed to commence the drilling of a well within 30 days and to complete the drilling of the well to a sufficient depth to test the present producing horizon. The agreement contained the following provision:

Time is of the essence of this agreement, and failure of Vendee for any reason to spud in said well as and within the time above provided shall entitle vendor at its option to terminate this contract forthwith and absolutely.

The vendee, after completion of the first well, was to drill such additional wells as might be required to develop and protect the property. The vendor agreed to assign to the vendee portions (hereinafter for convenience referred to as one-fourth of seven-eighths) of the vendor's retained interest in the leases until the vendee should receive, from the proceeds of that one-fourth plus the proceeds of the vendee's one-half of the seven-eighths interest, an amount equivalent to the total expended by the vendee in the development of the property, plus the $37,639.25 paid to the vendor. Thereafter, the vendee's interests in the one-fourth of seven-eighths should terminate and the full one-half of seven-eighths should remain the sole property of the vendor, so that the vendor and vendee would each own one-half of the seven-eighths interest and each should henceforth bear its one-half of the operating expenses in the jointly owned property. The vendee was to have exclusive control and sole management of the development and operation of the property. The agreement was carried out.

The petitioner received $16,815.16 during the fiscal year ended June 30, 1940, and $13,919.62 in the fiscal year ended June 30, 1941, from the one-fourth of seven-eighths temporarily assigned to it by Shasta. It credited those amounts to the larger development costs previously incurred. The petitioner did not report the two amounts above mentioned in income, but the respondent included them in income in determining the deficiencies.

The petitioner acquired some interests in other oil leases, under contracts requiring it to drill wells, similar to the agreement already described, except for the absence of a cash payment, and it received payments which were treated similarly. The only distinction made by either party between these agreements and the Carlock agreement is one made by the petitioner in which it points to the payment of cash in the Carlock agreement as giving the petitioner a basis for its alternative argument on the first issue.

The petitioner's first contention is that it is entitled to deduct the intangible drilling and development costs on all of the leases as

expenses. The Commissioner has held that it may not deduct those expenditures as expenses, but must capitalize them because the petitioner acquired its interest in the leases for the consideration that it develop, equip, and operate the leases, and those expenditures represent the petitioner's capital investment in the property. He relies upon *F. H. E. Oil Co.*, 3 T. C. 13; affd., 147 Fed. (2d) 1002; rehearing denied, 149 Fed. (2d) 238; second motion for rehearing denied, 150 Fed. (2d) 857; *King Oil Co.* v. *Commissioner*, 153 Fed. (2d) 690; and *Alex McCutchin*, 4 T. C. 1242, 1254. The petitioner concedes that those decisions are contrary to its contention, but asks this Court to reconsider the question. The Court will not reconsider the question at this time, but holds on this point for the respondent upon authority of the cases just cited.

The petitioner contends, in the alternative, that it is entitled to deduct one-half of the intangible drilling and development costs, at least in the case of the Carlock lease, because it purchased a one-half interest in that lease for cash and by its obligations to develop the property it only obtained the other conditional interests. The terms of the lease do not bear out this contention. The agreement was not divisible. The petitioner did not acquire its interest by the payment of cash alone, but by paying cash and agreeing to drill and develop the property. The entire intangible drilling and development costs were a part of the consideration which the petitioner paid for the interest which it acquired in that lease, and the cases above cited control. Section 29.23 (m)–16 of Regulations 111, to which the petitioner refers, but which by its terms does not apply to the facts or the years here in question, does not aid the petitioner.

The petitioner's contention on the second issue is that the income from oil produced from the fractional interests in the leases assigned to the petitioner only until it was reimbursed from those interests and from its own separate interests for certain outlays, was the income of the assignors and not its income. Its theory is that it received the proceeds from those temporarily assigned fractional interests, not as income to it, but rather as a reimbursement from the assignors for their shares of the intangible drilling and operating costs. The Court is unable to agree with this contention of the petitioner. The somewhat complicated terms of the agreements to which the petitioner refers merely express the agreement of the parties as to how they desire the income from the oil and gas to be shared between them. Cf. *Hiram T. Horton*, 7 T. C. 957. The other party to each agreement contributed an interest in an oil and gas lease. The petitioner agreed to use its own funds and facilities to drill and develop the properties under the leases. Its reward was to come only from oil which might be produced from certain interests in the leases.

The contracts specified just how much of the oil the petitioner was to have. It was to have all of the oil from certain fractional interests, while from others it was to have all of the oil only until the income therefrom equaled certain ascertainable amounts. Some of the leases involved in *Hugh Hodges Drilling Co.*, 43 B. T. A. 1045, contained similar provisions. One of the questions involved in that case was whether income from oil produced from fractional interests temporarily assigned to the petitioner was income to it. It was held that the amounts received constituted gross income to the petitioner. Likewise, all that the present petitioner received from the production of oil under these agreements was its income, to do with as it saw fit. The mere fact that the amount to be received from some of the fractional interests was to be measured by a part of the expenditures theretofore made by the petitioner, does not prevent that income from being taxable to the petitioner. The assignors did not receive it either actually or constructively. It did not represent their income which they permitted to be diverted in the acquisition by them of a capital asset. They acquired an interest in the intangibles as the hole was drilled, not from later production. The contract also provided that when it had been performed to a certain stage they were to have an interest in the tangibles. But the amounts here in question were in no case *quid pro quo* in the acquisition by the assignors of a capital asset.

The agreement in regard to the Carlock lease is different in one respect from the others. The petitioner paid Shasta $37,639.25 in 1939 when the agreement was entered into. Shasta temporarily assigned to the petitioner a one-fourth of seven-eighths interest (one-half of Shasta's retained share) until from that one-fourth and from the petitioner's one-half the petitioner should receive the equivalent not only of the development costs, but also of the $37,639.25. The petitioner's argument described above as applied to this situation would be that Shasta was repaying from its share of production one-third of the development costs and one-third of the $37,639.25. That argument, in so far as it applies to the development costs, has been discussed above. A further weakness in that argument appears when its application to the $37,639.25 is considered. The petitioner has not suggested any reason why the income which it received from the one-fourth of seven-eighths interest measured by one-third of $37,639.25, would represent income to Shasta or would not represent income to the petitioner. That part of the income from production in no way benefited Shasta. Obviously, the terms of the agreement were merely a means adopted by the parties for measuring the part of the income from production to be retained by the petitioner. The Commissioner did not err in taxing all of the income here in question to the petitioner.

*Decisions will be entered for the respondent.*