CARL A. PRATER AND DELLA JANE C. PRATER, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59521. Filed September 26, 1958.

*Henry Schwartz, Esq.*, for the petitioners.
*J. C. Linge, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income tax and an addition to tax against petitioners as follows:

| Year | Deficiency | Addition to tax sec. 294 (d)(2) |
|---|---|---|
| 1950 | $91.00 | |
| 1951 | 1,331.98 | |
| 1952 | 688.60 | $69.40 |

The issues for decision are: (1) Whether petitioners should be allowed to deduct losses from certain operating oil wells for the years

1950 and 1951 and realized income from the properties in the year 1952; (2) whether petitioners should be allowed net operating loss carryover deductions in the years 1951 and 1952 based on net operating losses for the years 1949 and 1950; and (3) whether petitioners are liable for an addition to tax for substantial underestimation of estimated tax for the taxable year 1952.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioners, husband and wife, are individuals living in Tyler, Texas. They filed joint income tax returns for the calendar years 1950 and 1951 with the then collector of internal revenue at Dallas, Texas, and for the calendar year 1952 with the district director of internal revenue at Dallas, Texas. Petitioner, Della Jane C. Prater, is involved in this case solely by reason of her having filed such joint returns with her husband, Carl A. Prater.

Carl A. Prater (hereinafter referred to as petitioner), was at the beginning of 1950 an independent oil producer, royalty owner, and independent dealer in oil and gas leases, and had been engaged in such businesses for approximately 10 years previous thereto. In 1950 he became interested in the oil property in the neighborhood of Post, Texas, and inquired from individuals in that area whether any leases were available in the vicinity of producing wells. He learned that a man named Malouf owned property adjacent to producing wells and might be willing to deal with some person who was to his personal liking. Petitioner contacted Malouf, who then made a personal inquiry of petitioner and tentatively agreed to grant him a lease for $10,000 in cash and a one-fourth royalty, if petitioner would drill a well without delay. Malouf requested an additional 2 weeks for further investigation before signing the lease.

While Malouf was conducting his investigation of petitioner, the latter sought the aid of his friend, S. W. Sibley, to obtain the necessary financing for the project. Sibley and petitioner had been associated in the P & S Oil Corporation which operated two producing oil wells in the East Texas field in the late 1930's. After the P & S Oil Corporation was sold out, petitioner continued to associate in business ventures with Sibley, although infrequently. Sibley had told petitioner that he would be willing to finance ventures in oil property whenever petitioner might find one available, and that he would grant petitioner an interest in such property in exchange for his efforts in acquiring and developing the leases. Sibley was interested in acquiring the Malouf lease and agreed to furnish the $10,000 cash payment and subsequent capital necessary to develop the property. Under the agreement, Sibley, his wife, and his son were to

receive a two-thirds interest in the working interest, and petitioner would receive a one-third interest. However, Sibley would receive all of the income from the oil production until he had recovered therefrom the initial payment and later expenses of drilling and development. Thereafter, petitioner would share fully in the costs and net proceeds of the enterprise.

Prior to the time Malouf made final settlement on the lease, petitioner was introduced to O. C. Garner, who asked petitioner if he would be interested in acquiring the lease to a 1-acre tract adjoining a producing well then belonging to him and his brother, J. L. Garner. In lieu of a cash payment, the Garners were to receive under the suggested arrangement a one-eighth overriding royalty, burdening the working interest, in addition to their one-eighth landowner's royalty. Petitioner approached Sibley with respect to this potential lease. Sibley expressed interest in it and agreed to finance the venture according to the same arrangement as set out above with respect to the Malouf property.

On March 30, 1950, J. L. Garner and O. C. Garner, and their respective wives, as lessors, executed an oil- and gas-mining lease (hereinafter called the Garner lease), in favor of S. W. Sibley, trustee, as lessee of the above-mentioned property, and retained a one-eighth underlying royalty interest in the land. Sibley, trustee, then conveyed one-eighth of the working interest in the Garner lease to O. C. Garner. Thereafter, on April 10, 1950, pursuant to the agreement between Sibley and petitioner, Sibley, trustee, transferred an undivided one-third of the remaining seven-eighths working interest held by Sibley in the Garner lease to petitioner. The pertinent provisions of the instrument read as follows:

Whereas, the said S. W. Sibley, Trustee, is the owner of ⅞ths of the ⅞ths working interest under said lease, together with all rights thereon under or incident thereto.

Now Therefore, I, S. W. Sibley, Trustee, hereafter referred to as assignor, for and in consideration of $1.00, and other good and valuable consideration to me in hand paid by C. A. Prater, hereafter referred to assignee, the receipt of which is hereby acknowledged, have this day and do by these presents Bargain, Sell, Transfer Assign and Convey unto the said C. A. Prater, his heirs and assigns, an undivided ⅓rd of the ⅞ths of the ⅞ths working interest in and to all of the oil, gas and other minerals in, on and under, and that may be produced from said land under the terms of the said oil and gas lease above described subject to the following covenants and conditions:

a. That the said S. W. Sibley, Trustee, agrees to develop said land and drill the same for oil in accordance with the terms of the lease contract executed in his favor by J. L. Garner, et al, as above set out, and that he shall advance ⅓rd of all costs of development for the benefit of the assignee herein, and that the said assignor shall retain, and is hereby authorized and empowered to retain out of the production, the ⅓rd thereof representing the interest here assigned, after the payment of all cost of operation, including gross production and pipe line

taxes, until such time as the said assignor shall have received the entire ⅓rd of the cost of development so advanced by assignor for the benefit of assignee, plus interest at the rate of 6 per cent per annum.

b. That after the assignor has been fully repaid all sums advanced for the benefit of assignee as aforesaid, assignee shall receive his full share of the production subject to his porportionate [*sic*] part of all cost of production and operation including taxes.

On April 11, 1950, M. J. Malouf as lessor executed an oil- and gas-mining lease, in and to a seven-eighths working interest, covering the Malouf properties referred to above, which lease is hereafter referred to as the Malouf lease, in favor of Sibley, Frances J. Sibley, and Warren Sibley and petitioner, as lessees. Malouf also reserved to himself a one-eighth overriding royalty interest.

In respect to the above leases, petitioner had the properties surveyed, applied for and obtained the Rule 37 exception to the rules of the Texas Railroad Commission, obtained permits to drill, actually contacted the drilling contractor, made the locations and supervised the drilling and completion of the wells, equipped them, and generally carried on the operation. Sibley took no active part in the acquisition, exploration, and development of the leases other than furnishing the requisite financing and receiving the leases as a lessee.

Petitioner contacted the Sparkman Drilling Company to undertake the drilling operations. The lessees and the Sparkman Drilling Company entered into a drilling contract on April 24, 1950, with respect to the above-mentioned properties, pertinent provisions of which are as follows:

THIS CONTRACT AND AGREEMENT entered into this 24th day of April, 1950, by and between S. W. SIBLEY, Individually and as Trustee for WARREN SIBLEY, FRANCES SIBLEY and C. A. PRATER, hereinafter called OWNER, and T. M. SPARKMAN, dba SPARKMAN DRILLING COMPANY, hereinafter called CONTRACTOR.

\* \* \* \* \* \* \*

AND WHEREAS, Contractor has agreed to drill said wells, all as hereinafter more specifically set forth, to-wit:

OWNER HEREBY AGREES:

1. To survey and stake the locations above described and furnish Contractor free ingress and egress to said premises and a sufficient part thereof to conduct the drilling operations thereon.

2. To supply and pay for a sufficient amount of surface pipe and the cement and cementing service for same.

3. To furnish float collar, guide shoe, equalizers, cement and cementing services as are necessary to set casing, if owner elects to attempt completion.

4. To pay the Contractor the monetary consideration hereinafter provided for in the amounts and in the times hereinafter provided, which said sums when paid shall constitute and be payment in full to the Contractor for all services and material used by Contractor in drilling the wells herein provided for.

\* \* \* \* \* \* \*

COMPENSATION

Upon completion of each well by Contractor as herein provided for, Owner shall immediately pay Contractor $3.00 per foot for each foot drilled by Contractor from surface to total depth of the well. In addition, all rig time as herein provided for shall be at the rate of $325.00 per day, or fractional part thereof, and shall be paid for at the same time.

On June 16, 1950, the First National Bank of Waco, Texas (hereinafter referred to as the Waco Bank), loaned $100,000 for drilling expenses and development of the properties covered by the Garner and Malouf leases. The loan was evidenced by three notes of even date therewith payable to the Waco Bank, executed by S. W. Sibley, individually and as trustee, Frances J. Sibley, and Warren Sibley (hereinafter referred to collectively as the Sibleys), in the amounts of $50,000, $15,000, and $35,000, respectively, and secured by a deed of trust executed on such date in favor of the Waco Bank by the Sibleys and petitioner, covering the Garner and Malouf leases. The deed of trust provides in part:

It is contemplated by the parties hereto that the undersigned will become indebted to The First National Bank of Waco, at Waco, Texas, for additional sums of money advanced by saidn [sic] Bank, and it is the intention of the parties hereto that this Deed of Trust shall secure such future indebtednesses as shall arise by reason of the advance of money to the undersigned and evidenced by written instrument making reference to this Deed of Trust as security.

Subsequent to the execution of the above contract, three wells were drilled on the Garner and Malouf leases, which wells were known as the Malouf No. 1 and Malouf No. 2, and the Garner No. 1. These wells were completed on or about May 17, 1950, June 14, 1950, and July 1, 1950, respectively.

At about the time the first well was completed on the Malouf lease, Sibley approached Oxsheer Smith, a friend of his, who was president of the Citizens National Bank of Cameron, Texas (hereinafter referred to as the Cameron Bank), and who had had previous business dealings with petitioner. In a conversation that transpired at a time when Smith was examining the oil properties, he suggested to Sibley that instead of restricting the venture to the drilling of just the Malouf and Garner leases, the venture be expanded by acquiring more leases and drilling more wells. He suggested that petitioner's role in the venture be to investigate new leases and arrange the purchase of those which were satisfactory risks in the opinion of Sibley and Smith, while Smith would insure the adequate financing of each well.

Pursuant to the above plan, petitioner on July 30, 1950, transferred his interest in the Garner and Malouf leases to Sibley, trustee. On July 31, 1950, Sibley, individually and as trustee, with Frances and Warren Sibley, his wife and son, transferred one-half of their com-

bined interest in the Garner and Malouf leases to Oxsheer Smith, subject to the outstanding indebtednesses to the Waco Bank.

On August 1, 1950, the Sibleys, Smith, and petitioner entered into a formal written agreement, pertinent provisions of which are:

WHEREAS, heretofore Carl A. Prater was the owner of an undivided one-third interest in and to said above described leases, but that the Grantors and Grantee herein for a valuable consideration paid have adjusted their respective interests by instruments appearing of record in Garza County, Texas, in accordance with the terms of this conveyance and agreement and it is specifically agreed by the Grantors herein that this conveyance shall be effective as of the date of the first oil runs made from said leases and that the Grantee shall share in such runs in the portion to which he would be entitled under this conveyance if interest here conveyed had been conveyed to him on the day of such first runs.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That we, S. W. Sibley, Trustee, S. W. Sibley individually and Frances J. Sibley, husband and wife, the said Frances J. Sibley acting by and through her attorney in fact, S. W. Sibley, Jr., and Warren Sibley, Individually, of Dallas County, Texas, and Oxsheer Smith of Cameron, Texas, for and in consideration of $10.00, and other good and valuable consideration, to us in hand paid, by Carl A. Prater, of Tyler, Texas, the receipt of which is hereby acknowledged, have this day, and do by these presents, bargain, sell, transfer, assign and convey unto the said Carl A. Prater an undivided ¼th interest in and to the above described leases subject to said above described outstanding interests and lien in favor of The First National Bank of Waco, Waco, Texas, but together with all personal property used or obtained in connection with said leases. It being the intention of the undersigned to convey to the said Carl A. Prater an undivided ¼th interest of the interest owned by the undersigned so that the said S. W. Sibley, Trustee, S. W. Sibley, Individually and Frances J. Sibley, husband and wife, and Warren Sibley shall be the owners of an undivided 37½ per cent interest in and to the whole working interest under said leases; so that the said Oxsheer Smith shall be the owner of an undivided 37½ per cent interest of the whole working interest under said leases, and so that the said Carl A. Prater shall be the owner of an undivided 25 per cent interest in the whole working interest under said leases.

To HAVE AND To HOLD said interest unto the said Carl A. Prater his heirs and assigns forever subject to the following terms and conditions.

(a) That the said S. W. Sibley, Trustee, S. W. Sibley, Individually, Frances J. Sibley, Warren Sibley and the said Oxsheer Smith covenant and agree with the said Carl A. Prater that they shall fully develop said leases for oil and/or gas as provided for under the terms of said lease contracts, and that they will advance all money required in the development of said leases in accordance with the terms thereof, except that it is understoodand [sic] agreed that S. W. Sibley, Trustee, S. W. Sibley, Individually, Frances J. Sibley, Warren Sibley and the said Oxsheer Smith shall have and do hereby retain unto themselves the entire production of oil and/or gas fromsaid [sic] leases until the entire cost and expenses advanced for the development of said lease have been fully repaid to them, together with such sums as shall have been advanced by them for the operation of said leases until such time as they shall have been repaid all moneys advanced by them as aforesaid, at which time the parties hereto agree to execute the necessary division orders or any other necessary instruments in favor of the said Carl A. Prater for the ¼th interest here conveyed to him; and, in this connection, the said Carl A. Prater agrees to then and

thereafter bear his porportionate [*sic*] part of the costs of operation and production and such further development as shall be agreed upon between the parties; and it is further agreed that the said Carl A. Prater shall Be Charged by the undersigned, interest at the rate of 4 per cent per annum on the ¼th of the moneys advanced for development and operation of said leases until the assignors have been fully repaid all sums advanced.

(b) That Assignors herein agree to deliver to the said Carl A. Prater, his heirs and assigns, on or before the 1st day of April, July and October of each year a statement of accounts, including itemized statement of all amounts received and sums expended in connection with the development and operation of said leases, and that on or about January 1 of each year to deliver to the said Carl A. Prater a like statement certified correct by a certified public accountant.

(c) That the assignors herein covenant to and with the said Carl A. Prater that they shall hold him free and harmless of all personal liability, loss and harm for moneys borrowed in connection with the development or operation of said leases, including the obligation hereinabove referred to payable to the First National Bank of Waco, Waco, Texas.

Thereafter petitioner, Smith, and Sibley acquired three additional leases similar to the Malouf and Garner leases. These acquisitions were as follows:

| Date | Lessor | Lessee |
|---|---|---|
| Aug. 17, 1950 | Hudson | Smith, Sibley and petitioner |
| Aug. 17, 1950 | Church | Smith, Sibley and petitioner |
| Nov. 5, 1950 | Valadez | Smith, Sibley and petitioner |

Neither Smith nor the Sibleys took any active part in seeking these leases, arranging their acquisition, in the drilling or development thereof, except to furnish the necessary capital or to secure the loans therefor.

Drilling permits and actual drilling were acquired and completed as follows: .

| Date | Drilling permit issued to | Name of well | Date commenced | Date completed |
|---|---|---|---|---|
| May 18, 1950 | S. W. Sibley, trustee | Garner No. 1 | June 15, 1950 | Aug. 3, 1950 |
| Apr. 13, 1950 | S. W. Sibley, trustee | Malouf No. 1 | May 3, 1950 | May 17, 1950 |
| May 30, 1950 | S. W. Sibley, trustee | Malouf No. 2 | June 14, 1950 | June 14, 1950 |
| July 11, 1950 | S. W. Sibley, trustee | Malouf No. 3 | Aug. 7, 1950 | Aug. 20, 1950 |
| Aug. 24, 1950 | S. W. Sibley, trustee | Malouf No. 4 | Sept. 9, 1950 | Sept. 23, 1950 |
| July 24, 1950 | James N. Cogdell | Hudson No. 1 | Aug. 24, 1950 | Sept. 5, 1950 |
| June 30, 1950 | C. A. Prater, trustee and S. W. Sibley. | Church No. 1 | Sept. 30, 1950 | Oct. 11, 1950 |
| Oct. 23, 1950 | C. A. Prater, trustee and S. W. Sibley. | Valadez No. 1 | Nov. 8. 1950 | Nov. 19, 1950 |

The above wells were known collectively as the Post Wells. The certificate of allowable production in the case of each of the above wells was issued by the Railroad Commission of Texas in the name of S. W. Sibley, trustee, and C. A. Prater.

Division orders were executed in respect to the oil runs as production was obtained from the five leases comprising Post Wells. Payments for the oil runs in respect to the Garner lease were made directly to the Waco Bank in accordance with the division orders for

the account of petitioner, Smith, and the Sibleys. Oil run payments from each of the other leases comprising Post Wells were made directly to petitioner, Smith, and the Sibleys, in their respective proportionate interests. Each month, upon receipt of the checks in payment for his interest in the oil runs from Post Wells, petitioner endorsed such checks over to the Cameron Bank for deposit to the joint account of S. W. Sibley, trustee for Post Wells, to be used for the operating expenses or for application to the indebtedness outstanding on borrowed funds used for the operations of the partnership. Both the Sibleys and Smith likewise assigned their checks to the same account for the same purposes.

Following the initial operation of the Post Wells venture, petitioner asked for and was allowed to draw a salary of $250 per month from the business for supervising the operation of the wells after they were completed and in production. This allowance was allowed him because he was in need of money to tide him over the early months of the operation. The amounts so drawn were reported as lease management fees by petitioner for each of the years in question.

Periodically, Smith wrote petitioner concerning the venture and at such times informed him of the status of the accounts at the bank as altered by the oil run checks and by the allotments to the expenses of operation. These reports stated the amount of oil run payment which was allocated to payment of the indebtedness and to the expenses of the venture attributable to petitioner's working interest. In August 1951, he wrote petitioner requesting that he discontinue drawing the fees from the Post Wells account. Petitioner, however, continued to draw the fees from the venture.

The development and operation of Post Wells resulted in net operating gains and losses for the taxable years in question as follows:

| Year | Net operating gain (or loss) | Amounts reported by petitioner |
|---|---|---|
| 1950 | ($61, 892. 21) | ($15, 473. 05) |
| 1951 | (2, 665. 20) | (666. 30) |
| 1952 | 15, 439. 58 | 3, 859. 90 |

For each of the years 1950 and 1951, Smith and Sibley filed partnership returns wherein each claimed 50 per cent of the net operating losses of Post Wells. By the end of 1952, the oil production from Post Wells had not equaled the drilling and development expenses.

For the period 1946 through 1952, petitioners filed income tax returns wherein they reported adjusted gross income or loss before the deduction of any net operating loss, as follows:

| Year | Individual returns | Adjusted gross income (or loss) | Year | Individual returns | Adjusted gross income (or loss) |
|---|---|---|---|---|---|
| 1946 | Joint | $2, 457. 66 | 1950 | Joint | ($13, 571. 90) |
| 1947 | Separate | 4, 669. 96 | 1951 | Joint | 7, 082. 74 |
| 1948 | Joint | (11, 346. 46) | 1952 | Joint | 9, 747. 74 |
| 1949 | Joint | (2, 792. 58) | | | |

For the year 1951, petitioners deducted a net operating loss carryover from 1949 and 1950 in the amounts of $1,938.22 and $12,145.64, respectively. For the year 1952, petitioners deducted a net operating loss carryover from the year 1950 in the amount of $6,049.04. Respondent determined that petitioners held no economic interest in Post Wells during the years 1950, 1951, and 1952. Accordingly, he disallowed the loss deductions attributable to that venture and adjusted the gross income to exclude the income reported from that same venture for those years. In addition, he disallowed the entire loss carryover from 1949 to 1951 because petitioners failed to show that a net operating loss for the year 1949 was greater than the amount of their income for the years 1947 and 1948. It has since been agreed that the amount of $1,938.22 net operating loss from the year 1949 is a net operating loss carryover. For the year 1950, respondent determined that petitioners' adjusted gross income, before the deduction of the net operating loss carryover from 1949, was $1,901.15. Petitioners were allowed a percentage depletion deduction in the amount of $753.44 for the year 1950. The return filed by the petitioners for the year 1952 indicated a tax liability in the amount of $468. Petitioners did not file declarations of estimated tax for the year 1952.

### OPINION.

Petitioner maintains that the determination of the first issue, namely, whether he may deduct the losses from the Post Wells operations for 1950 and 1951 and realized income therefrom in 1952, depends upon whether or not he held an economic interest in the Post Wells during the years in question.

The first lease acquired by the parties, the Garner lease, ran to Sibley as trustee. Sibley then transferred an interest in the lease to petitioner, but retained the production from that transferred interest until he had recovered therefrom the expenses "advanced" on behalf of that interest. Such a reservation is similar to a reservation of a royalty interest in oil production and is no less an economic interest in the oil in place than a limited royalty interest to be paid out of future production. In *Palmer* v. *Bender*, 287 U. S. 551, 557 (1933), the Supreme Court stated:

Similarly, the lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. *It is enough if, by virtue of the leasing transaction, he has retained a right to share in the oil produced.* If so he has an economic interest in the oil, in place, which is depleted by production. Thus, we have recently held that the lessor is entitled to a depletion allowance on bonus and royalties, although by the local law ownership of the minerals, in place, passed from the lessor upon the execution of the lease. See *Burnet* v. *Harmel, supra; Bankers Pocahontas Coal Co.* v. *Burnet, ante* p. 308. [Emphasis supplied.]

It is of no importance that Sibley was the lessee of the Garner lease and that he transferred a part of his leasehold interest to petitioner. Nor is it of importance that the reserved interest is measured by the amount of the moneys expended for the development of the property. The Supreme Court in *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25, 32 and 33 (1946), indicated that the tax consequences of an arrangement do not depend on who the fee holder of the land is or whether one holds legal title to the lease, but who has the right to the oil in place. The facts here before us clearly indicate that, during the years in question, Sibley held the right to the oil produced from the interest transferred to petitioner. Therefore, Sibley, not petitioner, held the economic interest in the oil in place, attributable to the leasehold interest transferred. *Burton-Sutton Oil Co.* v. *Commissioner, supra.*

The Malouf lease was acquired by Sibley and petitioner. However, the agreement between petitioner and Sibley gave Sibley the right to the oil production until he had recovered from that interest the advanced expenses. The same rule applies to the oil production from the Malouf lease as that applicable in the case of the Garner lease. During the years in question, Sibley held the economic interest in the oil in place, attributable to petitioner's leasehold interest in the Malouf lease. *Burton-Sutton Oil Co.* v. *Commissioner, supra.*

Pursuant to the agreement between petitioner, Sibley, and Smith, the interests in the leases were somewhat altered. However, petitioner did not acquire a right to the oil production. His interest in the oil was still limited to the oil produced after Sibley and Smith had recovered the advanced expenses out of his leasehold interest. The leases acquired subsequent to the new agreement were subject to the same terms as the Garner and Malouf leases. Petitioner would hold no economic interest in the oil in place, from any of the leases, until the advanced expenses had been recovered. Moreover, petitioner, at no time, became obligated to pay any of the expenses of the operation. Sibley agreed to furnish all necessary funds before Smith entered the picture. The notes to the Waco Bank were signed by the Sibleys. Petitioner was required to sign the deed of trust on the leasehold interest, but was not personally liable on the notes. Petitioner did not spend any of his own moneys to pay for the expenses of the operation. There is no basis upon which petitioner can deduct such expenses for which he was never liable to pay, nor did in fact pay. See *United States* v. *Anderson*, 269 U. S. 422 (1926); and *Eckert* v. *Burnet*, 283 U. S. 140 (1931). To hold otherwise, under the facts before us, would be simply to ignore the economic realities of the various arrangements here involved. Since petitioner held no economic interest in the production of the Post Wells during the years in question, and incurred no liability for the expenses of the operations, the op-

erating losses from that operation for the years 1950 and 1951 were properly disallowed by respondent, and the operating profit for the year 1952 from that operation was properly excluded from income. We do not deem it of significance that petitioner received oil division payments which were immediately assigned to the banks. Petitioner had no right to the payments and was required by the agreements, which he had entered into, to use the payments as directed by the other parties.

Petitioner argues that the situation before us here is similar to the carried interest in *J. S. Abercrombie Co.*, 7 T. C. 120 (1946), affd. 162 F. 2d 338 (C. A. 5, 1947). However, in the instant case, petitioner would not have been required to repay any of the money advanced by either Sibley or Smith had the Post Wells operation proved unable to return them their advances. Therefore, the facts of this case most resemble the arrangement in *Manahan Oil Co.*, 8 T. C. 1159 (1947), wherein this Court held that the agreement constituted a division of the oil production and the carrying interest was taxable on the production which was recovered from the carried interest.

The determination of the above issue disposes of the question whether petitioner can deduct, in the years 1951 and 1952, an operating loss carryover of the Post Wells operation from the year 1950. Since petitioner cannot deduct the operating loss for the year 1950, there exists no operating loss carryover available to him as a deduction for 1951 and 1952. Sec. 122, I. R. C. 1939.[1]

It is agreed that $1,938.22 operating loss from the year 1949 is an operating loss carryover. However, the only question is the amount of deduction allowable for 1951. Sec. 122, *supra.*

The net operating loss carryover deduction for 1951 would then be the amount of the net operating loss for 1949, in the amount of $1,-

---

[1] SEC. 122. NET OPERATING LOSS DEDUCTION.
  (b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—
 
  *  *  *  *  *  *  *
 
  (2) NET OPERATING LOSS CARRY-OVER.—
 
  *  *  *  *  *  *  *
 
  (B) Loss for Taxable Year Beginning After 1949.—If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years, except that the carry-over in the case of each such succeeding taxable year (other than the first succeeding taxable year) shall be the excess, if any, of the amount of such net operating loss over the sum of the net income for each of the intervening years computed—
 
  (i) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and
 
  (ii) by determining the net operating loss deduction for each intervening taxable year, without regard to such net operating loss or to the net operating loss for any succeeding taxable year and without regard to any reduction specified in subsection (c).
 
  *  *  *  *  *  *  *
 
  (d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:
 
  (1) The deduction for depletion shall not exceed the amount which would be allowable if computed without reference to discovery value or to percentage depletion under section 114(b)(2), (3), or (4);

938.22, reduced by the net income for the year 1950, computed without reference to the percentage depletion deduction. Petitioner's corrected net income for 1950 was $1,901.15 and the allowed percentage depletion deduction was $753.44. The net income for 1950, computed without reference to the percentage depletion deduction, would be $2,-654.59. The net operating loss in the amount of $1,938.22 is exceeded by the net income for 1950 computed without reference to the percentage depletion deduction. Therefore, no net operating loss carry-over deduction is allowable for 1951.

The remaining issue, whether petitioner is liable for an addition to the tax for substantial underestimation of the estimated tax for the taxable year 1952, is controlled by our determination of the first issue in favor of respondent.

*Decision will be entered for the respondent.*