Dave Rubin and Jennie Feldman Rubin v. Commissioner.
Rubin v. Commissioner
Docket No. 45971.
United States Tax Court
T.C. Memo 1959-223; 1959 Tax Ct. Memo LEXIS 21; 18 T.C.M. (CCH) 1067; T.C.M. (RIA) 59223; 11 Oil & Gas Rep. 446; November 30, 1959
Wentworth T. Durant, Esq., and Wilbur E. Swenson, C.P.A., 812 Tyler Street, Amarillo, Tex., for the petitioners. David E. Mills, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding is before us pursuant to remand by the Court of Appeals for the Fifth Circuit, 252 F. 2d 243. The respondent determined a deficiency in income tax of $14,660.05 for the year 1946. In our original opinion, 26 T.C. 1076, we resolved certain issues as to the deductions allowable for that year and the deficiency is now conceded *22 to be $14,418.51. We also decided that there was no net loss carryover from 1944 to 1946 and this is no longer disputed. The issue remaining concerns a claimed net loss carryback from 1947 which the petitioners contend is sufficient to eliminate the deficiency for 1946. Pursuant to the remand a further hearing was held and additional evidence was received. The revised findings of fact herein relate to the 1947 transactions and the computation of any applicable loss carryback to 1946. The petitioners' return for 1946 was filed with the collector of internal revenue at Dallas, Texas. Findings of Fact The petitioners, husband and wife, resided in Amarillo, Texas, and in Dallas, Texas, in 1946 and 1947. Dave Rubin was engaged in managing oil properties for a number of years. Prior to 1942 he was married to Bessie Rubin. Bessie died in 1942, intestate, leaving four adult children of a former marriage and of her marriage with Dave. Subsequently, a daughter, Marsha Saxe, died leaving three minor children and her husband as heirs. There was no probate of Bessie Rubin's estate. Dave and Bessie had possessed, in community, interests in certain oil properties herein referred to as the Barnhill *23 leases. These properties were subject to certain drilling commitments, and after 1942 Rubin attempted to meet these commitments. The surviving children of Bessie gave powers of attorney to Rubin to manage their inherited interests. Later they gave absolute conveyances to Rubin which were recorded. At the same time Rubin gave them separate reconveyances which were not placed on record until the summer of 1946. In the operation of the properties Rubin incurred indebtedness on behalf of the venture in the amount of several hundred thousands of dollars. Rubin sold an oil payment to Nubar Oil Company in an amount in excess of $200,000 to obtain other funds for operating the properties. On and prior to August 22, 1946, Rubin owned an undivided one-half interest in the Barnhill leases. Milton Rosenblume, Miriam Emmer and Mannie Jack Rubin each owned an undivided one-eighth interest. The remaining one-eighth interest was owned by William Saxe, Henry I. Saxe, Charlotte E. Saxe and Maurece T. Saxe and Rubin held a power of attorney over such interest. In August 1946 Rubin conveyed an overriding royalty in and to certain of the properties to Hugh L. Umphres and Hugh L. Umphres, Jr. The *24 First National Bank of Dallas, herein referred to as the bank, was one of Rubin's creditors. G. E. Hall and Joe Stewart were experienced oil well drillers. At the instance of the bank Hall negotiated with Rubin for an agreement whereby Hall and Stewart would drill and equip certain oil wells on the properties in which Rubin and the children of Bessie Rubin had interests. In March 1947 Rubin and Hall and Stewart entered into a letter agreement for operation of the Barnhill leases by Hall and Stewart, contemplating a subsequent formal contract. Rubin was to arrange for the transfer to him of the interests of the heirs of Bessie, and Hall and Stewart were to take up the Nubar oil payment and Rubin's indebtedness owing on March 31, 1947, amounting to $750,000 in all. One-half of the working interest was to be assigned to Hall and Stewart Drilling Company which was to operate the leases. Prior to April 1947 a friendly suit for partition was begun in the District Court of Potter County, Texas, in which the owners of interests were made parties. Rubin acquired the interests of Milton Rosenblume, Miriam Emmer and Mannie Jack Rubin subject to certain overriding royalties and for cash and *25 deferred cash considerations. The grantors retained a vendor's lien to secure the deferred cash payment. The conveyances by Mannie Jack Rubin and Miriam Emmer were dated April 1, 1947, and that by Milton Rosenblume was dated April 23, 1947. A decree was issued in the partition suit on July 29, 1947 which provided, among other things, that Hall and Stewart each owned undivided one-fourth interests in the properties and certain mineral rights, that Milton Rosenblume, Miriam Emmer, Mannie Jack Rubin, William Saxe, Henry I. Saxe, Charlotte E. Saxe and Maurece T. Saxe all were vested with certain overriding royalties and that Dave Rubin was vested with the title formerly vested in these heirs, subject to such royalty rights. Rubin thus had an undivided one-half working interest in such properties after the partition was complete. On April 5, 1947, Rubin and Hall and Stewart entered into an agreement concerning these properties, which provided, in part: "For and in consideration of the rights herein granted, and of the promises of grantees, and of the duties and obligations undertaken and assumed by the grantees, as herein set forth, the said grantor, Dave Rubin, of the County of Potter, *26 State of Texas, has granted, sold, assigned, and conveyed, and does by these presents grant, sell, assign, and convey unto the said grantees, G. E. Hall and Joe Stewart each an equal undivided one-fourth of the following described real and personal property: "1. All personal property belonging to Dave Rubin on the lands and leases hereinafter described that has heretofore been used in connection with the management, operation, and development of said properties for producing and developing oil and gas, being the same personal property that is now in charge of the grantees under the authority of Dave Rubin. Grantees shall immediately make written inventory of such personal property, with their valuations of the respective items, and deliver the same to the grantor. "[The described property included, among other things, oil and gas leases, minerals, mineral interest and gas purchase agreements.] * * *
"(a) As consideration for the foregoing grant, sale, assignment, and conveyance, the said G. E. Hall and Joe Stewart, grantees, agree and promise Dave Rubin, grantor, that they will refinance grantor to the amount of $750,000.00, or to the amount of his indebtedness as of April 1, 1947, whichever *27 amount is the smaller, by taking up, either directly or through Dave Rubin, such indebtedness as is owing by Dave Rubin or stands as charges or incumbrances against the property described * * * above * * * and that grantees will hold the amount of such indebtedness, after taking it up, as a charge or incumbrance against the oil and one-half of the gas to be produced from all the lands described in the aforesaid legal description paragraphs hereof, until the full amount of such indebtedness so to be taken up shall be repaid to the grantees * * * "(b) The grantees shall, as a material and primary consideration for this conveyance, grant, and assignment, drill and equip on said lands six wells for producing oil during each month hereafter, beginning immediately; provided only that material, supplies, and labor necessary for drilling and equipping six wells per month are available; if materials, supplies, and labor for drilling and equipping six wells per month are not available, the grantees shall nevertheless drill and equip at least three wells per month until one hundred wells shall have been drilled and equipped on said land on 20 acre locations to be made by them; * * * The price *28 for the drilling and equipping of each well hereunder is agreed to by $26,500.00, and grantees shall receive payment for that amount per well, out of production for drilling and equipping them as herein specified. * * * "(c) It is agreed that grantor shall be entitled to manage and sell the gas produced from said lands, after it is produced, and the $2,550,000.00 consideration to be paid to grantor, as hereinafter specified and provided, shall receive credit for one-half of all proceeds of the sale of the gas until all amounts payable to grantees out of production provided for herein shall be fully paid; thereupon and thereafter said one-half of all proceeds of the sale of the gas shall be paid into the operating fund which is established herein. * * *
"(e) Of all the proceeds of the oil and one-half the gas produced from said lands after grantees shall have received enough to liquidate and discharge the amount expended by grantees in taking up the indebtedness of grantor, as aforesaid, and the amount of $26,500.00 per well for each well of the first fifty wells that grantees shall drill and equip hereunder, all royalties specified in the aforesaid leases shall be paid out *29 of the production from which such royalties are payable under the terms of such leases; likewise, all the overriding royalties payable by the terms of grants or reservations shall be paid. Twenty-five per cent of the proceeds of all the oil and one-half the gas not necessary to pay the foregoing items, royalties, and overriding royalties, shall constitute an operating fund, and seventy-five per cent of all the oil and one-half the gas not necessary to pay the foregoing items, royalties, and overriding royalties, shall constitute a drilling fund; but although these two funds are established, the establishing of them shall in nowise impair or militate against the right of G. E. Hall and Joe Stewart to manage both funds together * * * until full payment to G. E. Hall and Joe Stewart has been made for each of the second fifty wells that they shall drill and equip hereunder. "(f) Until grantees shall have received from the aforesaid production the amount expended by them in taking up the aforesaid indebtedness of grantor and the amount necessary to pay grantees $26,500.00 for the drilling and equipping of each of the 100 wells that they shall drill and equip hereunder, the grantees shall *30 be entitled to receive and disburse all the proceeds of the sale of the production except one-half of the proceeds of the sale of the gas, from said leases, in accordance with the terms hereof; * * * "(g) After all amounts specified in paragraphs (a), (e), and (f) above have been fully liquidated and discharged, the royalties and overriding royalties shall thereafter be paid as in said paragraphs (a), (e), and (f) specified, and the costs and expenses of operating such properties; and, in the discretion of grantees, the drilling and equipping of any additional well's shall be paid out of the operating fund. Of the remaining seventy-five per cent of the proceeds of all the oil and gas, Dave Rubin shall be entitled to one-half on his own account and the grantees shall be entitled to the other one-half on their own account; and the parties shall be paid directly by the purchasers of such production, except that Dave Rubin shall also be paid directly by the purchasers of such production one-half of the one-half to which the grantees are entitled, until Dave Rubin shall have received from the proceeds of one-half of grantees' one-half the sum of two million five hundred and fifty thousand *31 dollars, less whatever amount Dave Rubin shall have already received from one-half of the proceeds of the sale of gas, this payment of $2,550,000.00 out of such production being consideration to grantor for making this grant, sale, assignment, and conveyance. * * *
"(i) It is understood and agreed that the one-half interest herein conveyed is burdened with the obligation and duty of managing and operating such properties as an entirety, for the equal advantage of the grantor and grantees, and that grantees, or the owners of the interests of the grantees at any time, shall have the right and duty to operate and manage such leases and to pay all necessary and reasonable costs of operation, charging one-half thereof to themselves and one-half to grantor, or the owners of grantor's interest at the time such expense is incurred. Costs and expenses shall include all ad valorem taxes on the entire properties of grantor and grantees herein, but shall never include wages or salaries to the owners of the grantees' one-half interest in excess of $12,000.00 per year, unless, at the same time, the owners of the grantor's one-half interest shall be paid an equal amount at the same time that *32 such wages or salaries in excess of $12,000.00 per annum are paid to the owners of grantees' one-half interest." Pursuant to the contract of April 5, 1947, Hall and Stewart paid $750,000 to refinance the indebtedness and discharge certain claims against the property. They paid $276,441.64 to Nubar Oil Corporation, and paid $10,005 each to Mannie J. Rubin, Miriam Emmer and Milton Rosenblume as well as $10,000 to the Court for distribution in the partition suit. They paid certain obligations of Rubin's and took assignments and releases from the creditors. They also paid certain notes of Rubin's. Hall and Stewart obtained a loan from the bank in the amount of $700,000 for which they gave their note secured by a deed to a trustee covering the properties involved. In June 1947 Rubin secured a lease from certain other individuals, including J. A. Whittenburg, Jr., Roy R. Whittenburg and others, and certain executors of estates and guardians covering oil and gas lands in Hutchinson County, Texas, herein referred to as the Hedgecoke-Whittenburg lease. On August 1, 1947, Rubin conveyed to Hall and Stewart each a one-fourth interest in this lease. Hall and Stewart thereby agreed to drill *33 and equip wells required by the terms of the lease and to rework and recondition wells already on the property. This contract did not provide for any cash consideration to Rubin. The price for drilling and equipping each well was fixed at $31,000 to be paid out of production. Rubin reserved a production payment of $200,000 out of proceeds after Hall and Stewart had recouped their drilling and completion costs. Equipment on the leases as of March 1947 had an allocated cost of over $750,000 and additional equipment was added during 1947 having costs of over $280,000. In the summer of 1948 Rubin and Hall and Stewart agreed to cancel the contracts of April 5 and August 1, 1947, and settle accounts. Pursuant to this agreement Rubin assigned to Hall and Stewart all his interest in the Hedgecoke-Whittenburg lease and Hall and Stewart assigned to Rubin their interests in the Barnhill leases. In these assignments the stated consideration was the cancellation of all Rubin's obligations to Hall and Stewart and of their obligations to Rubin. The oil and gas sales and the expenses of the leases operated by Hall and Stewart under the agreements of April 5 and August 1, 1947 were as follows: *34 Hedgecoke-
Barnhill
Whittenburg
Total
Oil and Gas Sales
$155,836.89
$44,219.12
$200,056.01
Gross Production Taxes
6,609.86
1,861.63
8,471.49
Operating Expense
80,070.85
35,812.28
115,883.13
General Expense
16,230.52
8,671.03
24,901.55
Development Expense
247,399.20
78,234.46
325,633.66
Depreciation allowable on lease and well equipment for the new equipment on these leases during the operations in 1947 amounted to $7,486.38 on the Barnhill leases and $2,019.01 on the Hedgecoke-Whittenburg lease, a total of $9,505.39. The net loss from operations of the leases during 1947 was $284,339.21. The petitioners' adjusted net income for 1945 was $66,788.79. They had a net operating loss carryover from 1944 giving a net operating loss deduction of $52,487.91, which was applied leaving a balance of $14,300.88 to be absorbed by any 1947 loss carryback. The petitioners' net income for 1946, as determined by the respondent, was $36,513.55. The computation of such income included long-term capital gain of $18,469.22 and depletion of $34,804.20. The petitioners' return for 1947 included long-term capital gains on sale of a scale, $375.47, *35 sale of a warehouse, $2,066.67 and sale of a royalty, $3,200. On the return deductions for depletion were claimed in the amount of $6,098.90 on a Brown-Kilgore lease and of $2,642.19 on royalties. Opinion The issue is whether the petitioners incurred a loss in 1947 sufficient as a loss carryback to eliminate the agreed deficiency for 1946. On their return for 1947, the petitioners reported $485,265.50 of the amounts paid by Hall and Stewart as representing income from cancellation of Rubin's debts in that amount in 1947 and claimed an adjusted basis of $493,474.26 on the properties transferred, resulting in a loss of $8,208.76 on that transaction. They reported other losses and claimed a loss of $109,821.89 on their return. The respondent's agent computed the correct basis in these properties as $212,744.56 and made adjustments resulting in a taxable income of $91,412.50, but no deficiency was formally determined for 1947 because of a loss carryback from 1949 which would eliminate any net taxable income in 1947. The properties here referred to as the Barnhill leases had been operated by Rubin as a managing partner of a partnership composed of Rubin and the heirs of his deceased *36 wife. This the respondent concedes. The petitioners now present a different argument. They say that the transaction with Hall and Stewart was nothing more than the sale to Hall and Stewart of the interests of Bessie Rubin's heirs. Rubin was to retain a one-half interest, the other half interest was to be transferred to Hall and Stewart who were to undertake the responsibility of development and operation of the whole property, the interests of the heirs were to be transferred free of indebtedness with retention of overriding royalties and payment of some cash. Court action to partition the property was commenced to effect transfer of the interests of the minor heirs and this was duly accomplished. The petitioners contend that the arrangement resulting was a partnership between Rubin and Hall and Stewart and the effect of the agreement of April 5 was that Hall and Stewart became Rubin's partners, in place of the heirs of Bessie Rubin. The contribution of Hall and Stewart, it is said, was their refinancing of the indebtedness of the former partnership. The contention is advanced that Rubin was previously liable for half the debts of the earlier partnership and now was liable for half *37 the debts of the successor partnership. Hence, he had no gain or loss by virtue of the transaction. Also, the petitioners contend that the income from one-half of the operation and the expenses allocable to that half should be treated as the income and expenses of Rubin and since the expenses exceeded the income realized in 1947 from operating these properties, a substantial loss was incurred by Rubin from this alone. The respondent takes the position that Rubin terminated the partnership with the heirs of his deceased wife and became the owner of the entire working interest in the Barnhill leases, that he sold a one-half interest to Hall and Stewart and received $485,265.50 as income through the cancellation of his indebtedness in that amount in 1947, resulting in a net gain for 1947, that the petitioners were not entitled to treat a share of the income in 1947 from operation of the properties as theirs nor to deduct any share of the expenses paid by Hall and Stewart under the contract of April 5, 1947, and finally, if they were entitled to operating loss deductions, such losses in 1947 were not sufficient in amount to affect the deficiency for 1946. The agreement of April 5, 1947 does *38 not purport to create a partnership between Rubin and the operators, Hall and Stewart. But this is not determinative. The respondent has interpreted an oil development arrangement under certain circumstances as in the nature of a joint venture or partnership for tax purposes. Rev. Ruling 54-84, C.B. 1954-1, 284. The agreement provided that Hall and Stewart
"will refinance grantor [Rubin] to the amount of $750,000 * * * by taking up * * * such indebtedness as is owing by Dave Rubin or stands as charges or incumbrances against the property * * *, and that grantees will hold the amount of such indebtedness, after taking it up, as a charge or incumbrance against the oil and one-half of the gas to be produced * * *." In the course of this refinancing Hall and Stewart took assignments from the various creditors of their claims against Rubin. When the parties terminated the arrangement in 1948 they expressed their intention to cancel all Rubin's obligations to Hall and Stewart and the operators' obligations to Rubin, indicating that all parties considered Rubin indebted to Hall and Stewart. These circumstances bear out the argument of the petitioners that the debts were not cancelled *39 and that Hall and Stewart in paying the claims became substituted as creditors of Rubin. The respondent argues that the operators agreed to look only to the oil for reimbursement, that Rubin was financially unable to pay the indebtedness personally and that the operators had no intention of relying upon him for payment if the oil production should fail. These factors, even if true, do not prove a cancellation of the indebtedness. Although the agreement of April 5, 1947 did not specifically provide that Rubin be liable for the indebtedness in the absence of sufficient production, there was no provision exempting him from such liability. This is a "carried interest" situation. The operators acquired a one-half interest in the Barnhill leases by "refinancing" Rubin and undertaking to drill wells and operate them. Rubin was the "carried party" with a onehalf interest. The operators were to recover their investment out of production from Rubin's interest as well as theirs before Rubin received anything from production, except as to one-half the gas proceeds which he had reserved. After the operators recovered their investment Rubin was to receive up to $2,550,000 out of one-half of the *40 operators' share or one-half of the gas, after which the production was to be shared onehalf by Rubin and one-half by the carrying parties. In 1947 the operators did not recover their investment and in 1948 the contract was cancelled by agreement. The respondent contends that this situation is similar to Manahan Oil Co., 8 T.C. 1159 (1947) in which we held that proceeds of fractional interests of the carried party temporarily assigned to the operator were income to the operator rather than to the carried party. In that case the carried party had no obligation to pay expenses allocable to its interest if production was inadequate to do this. The petitioners contend that the case of J. S. Abercrombie Co., 7 T.C. 120 (1946) affd. 162 F. 2d 338 (C.A. 5, 1947), Acq. 1949-1 C.B. 1, is applicable here. In that case the assignors retained a one-sixteenth carried working interest, and the operators were to recoup one-sixteenth of their expenditures by charging them against the production from the carried interest. We held that since income is taxable to the owner of the investment which produced it the income of the carried interest *41 belonged to the carried parties, as did also the expenditures chargeable to that interest. The Court of Appeals agreed, stating that "an assignment in anticipation of such income is ineffective to avoid taxation thereof to the real owner. The economic reality of the transaction was that the assigning co-owners mortgaged their interest to their operating co-owner; and by so doing they not only reaped the benefit of development but acquired an undivided one-sixteenth interest in valuable physical equipment placed on the property by the operators. The value of the leases was in the oil and gas that could be produced from the demised premises. The assignors desired to participate in the production to the extent of onesixteenth; and arranged by contract for its exploitation, reserving to themselves a share in the net profits that was not disassociated from the retained economic interest but was derived from such interest and partook of the quality of rent." We have had occasion to consider other carried interest cases recently. In Carl A. Prater, 30 T.C. 1262 (1958) (on appeal, C.A. 5) the carried party was under no requirement to repay any advances of the carrying parties *42 had the production been insufficient to do this. We held that the carrying parties were taxable on the production recovered from the carried interest, since the carrying parties held the economic interest in the oil in place attributable to the carried interest. In Myrtle J. Wood, 31 T.C. 528 (1958) (on appeal, C.A. 5) we held that the income from production allocable to the carried interest was taxable to the carried party. The carrying party there had the right to recover expenses out of oil or from sale of the fee interest of the carried party. In Estate of H. H. Weinert, 31 T.C. 918 (1959) (on appeal, C.A. 5) the carrying party, Lehman, advanced funds under a loan agreement and was to recover such advances only from production from the carried interest which was assigned to a trustee to secure the advances. We held that the advances were in fact loans and that the income of the carried interest was taxable to the carried party notwithstanding the stipulation for recovery solely out of profits arising from the carried interest. In that case we said (page 931): "In our opinion, under the facts in this case, Lehman did not acquire the equitable interest *43 in the oil and gas in place by virtue of these advances. The funds advanced were used to meet petitioner's obligation for his pro rata share of the drilling and recycling plant costs. They were not used to pay any part of Lehman's pro rata share of these costs. Lehman did not acquire any interest in the product of these expenditures and they were not made for Lehman's direct benefit. The funds advanced were used to provide a direct economic benefit to petitioner, being used to pay his obligations under the unitization agreements. Lehman acquired nothing for these advances except the right to be repaid, first, with interest, from the proceeds of petitioner's retained interest in the leases. The equitable interest in the proceeds assigned, insofar as they were used to repay these advances and interest, remained in petitioner. He assigned these proceeds, in trust, as security for the repayment of the loans. Even though petitioner may have had no personal obligation to repay the loans, the income from the pledged property having been received and used by the trustee to repay the loans and thus release the property and future income therefrom to petitioner, the income was received for the *44 economic benefit of petitioner and was taxable to him." In Anderson v. Helvering, 310 U.S., 404 (1940), IT WAS STATED THAT INCOME FROM PRODUCTION OF OIL AND GAS IS TAXABLE TO THOSE WHO HAVE A CAPITAL INVESTMENT IN THE OIL IN PLACE. In the present case Hall and Stewart advanced loans to Rubin to pay his creditors and took assignments of their claims. Rubin owed these amounts to Hall and Stewart He transferred to them one-half the working interest in the properties and in the personal property on the premises and the grantees were enttiled to receive all proceeds of production (except for the reservation of one-half the gas) until reimbursed for the advances then or subsequently made. In effect this was a mortgage or pledge of Rubin's retained one-half interest to secure the loans and subsequent loans contemplated by the contract. Hall and Stewart did not have to depend solely on oil production. There was considerable equipment on the leases and one-half of that was transferred. Also there was a possibility that Rubin could repay from other sources. The proceeds of Rubin's interest were being applied to pay his obligations and therefore inured to his benefit. Accordingly, *45 the income from his interest was taxable to him and the expenses allocable to that interest were his expenses. The Abercrombie, Wood, and Weinert Estate cases, supra, are applicable. This conclusion brings us to the problem of computing the income and expenses allocable to Rubin's interest in 1947. The leases included in the contract of August 1, 1947, were operated under a similar arrangement and the income and expenses of such leases should be treated similarly. The parties have presented various computations based upon their theories of the legal effect of the 1947 transactions. The petitioners' computations are erroneous in certain particulars, as, for example, including charges for wells which were not completed until 1948. The respondent's computations start with the assumption that Rubin realized income from cancellation of indebtedness, and assume that long-term gain was received from the Hall-Stewart transaction, which we have determined was not the case. When the supposed gains from these sources are eliminated, it appears that the petitioners had a loss in 1947, or at least no taxable net income, outside the Hall and Stewart transaction and the drilling operations. It *46 is not necessary to determine the exact amount of any such loss and for our purposes it is sufficient if the petitioners had no net taxable income outside of these items. In that situation, the computations of income and expenses least favorable to the petitioners show that Rubin's share of the loss from the Hall and Stewart operations of these leases was sufficient as a loss carryback to eliminate the agreed deficiency for 1946. The net loss from operations, according to the books of Hall and Stewart and shown in our findings of fact, was $284,339.21. One-half of this, allocable to Rubin, was $142,169.60. In computing the amount of the carryback this figure is to be reduced pursuant to section 122, Internal Revenue Code of 1939, [1] by adjustments for depletion of $6,098.90 claimed on the Brown-Kilgore lease, and $2,642.19 on royalties and by adjustments amounting to $5,642.14 for longterm capital gains. (The respondent computes an additional amount of long-term capital gain on the Hall-Stewart transaction, which we have found was not realized.) This reduces the loss carryback to $127,786.37. Next it is to be applied against the income for 1945 not previously absorbed by a 1944 net *47 operating loss deduction. This amounts to $14,300.88, reducing to $113,485.49 the amount carried back to 1946. The net income for 1946 according to the deficiency notice, was $36,513.55, which is subject to adjustments under section 122, of $18,469.22 for long-term capital gain and $34,804.20 for depletion. Adding the adjustments to the income gives a total of $89,786.97. Since the carryback exceeds this, it is sufficient to eliminate the deficiency for 1946. *48 Footnotes
1. SEC. 122. NET OPERATING LOSS DEDUCTION. (a) Definition of Net Operating Loss. - As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). (b) Amount of Carry-Back and Carry-Over. - (1) Net Operating Loss Carry-Back. - (A) Loss for Taxable Year Beginning Before 1950. - If for any taxable year beginning after December 31, 1941, and before January 1, 1950, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed - (i) with the exceptions, additions, and limitations provided in subsection (d)(1), (2), (4), and (6), and (ii) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss and without regard to any reduction specified in subsection (c). * * *
(d) Exceptions, Additions, and Limitations. - The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows: (1) The deduction for depletion shall not exceed the amount which would be allowable if computed without reference to discovery value or to percentage depletion under section 114(b)(2), (3), or (4); * * *
(4) The amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from such sales or exchanges. The deduction provided in section 23(ee) shall not be allowed.↩